[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-13110
_____

D.C. Docket No. 5:10-cr-00046-MTT-CHW-4

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

SHAWANNA REEVES,
a.k.a. Shawanna Halcomb,
MICHAEL MCSHUN REEVES,
a.k.a. Docious,
THORNTON LAMAR MOSS,
a.k.a. Slim,

Defendants - Appellants.

_____

Appeals from the United States District Court
for the Middle District of Georgia
_____
(February 6, 2014)

Before MARCUS and EDMONDSON, Circuit Judges, and VINSON,* District
Judge.

_____

* Honorable C. Roger Vinson, United States District Judge for the Northern District of Florida,
sitting by designation.

MARCUS, Circuit Judge:

Three co-defendants -- Michael Reeves, his wife Shawanna Reeves ("Halcomb-Reeves"),[1] and Thornton Moss -- appeal their jury trial convictions for conspiracy to distribute cocaine. Both Reeves and Halcomb-Reeves argue that there was insufficient evidence to sustain their convictions. Halcomb-Reeves also challenges several of the district court's evidentiary rulings. Specifically, she avers that the district court erred in admitting recorded telephone calls and a co-conspirator's statements against her at trial, as well as in denying her motion for a mistrial after a government case agent improperly revealed her invocation of the right to counsel. Moss asserts that a new trial is warranted because of a series of allegedly improper prosecutorial statements during closing argument. Finally, Reeves claims that the district court erred in its underlying determination of the drug quantity attributable to him at sentencing.

After thorough review, we affirm each of the defendants' convictions and sentences. We <u>sua sponte</u> remand for the limited purpose of correcting clerical errors in Reeves's written judgment.

I.

A.

---

[1] For the sake of convenience, we refer to Shawanna Reeves as "Halcomb-Reeves." The second superseding indictment referred to Ms. Reeves as "Shawanna Reeves a/k/a 'Shawanna Halcomb.'"

2

The essential facts are these. During the summer of 2009, Georgia Bureau of Investigation officials requested assistance from the Drug Enforcement Agency ("DEA") in the investigation of several individuals responsible for high levels of drug distribution in Baldwin County, Georgia. Federal authorities subsequently obtained a court-ordered wiretap, which led to the identification of numerous conspirators involved in a large-scale cocaine distribution network. A heavy volume of intercepted telephone calls revealed a substantial flow of narcotics from a Mexican supplier, Santana Romero-Diaz, to Deldrick Jackson of Atlanta. Using couriers, such as Danielle Finney, to transport the cocaine from Tucker, Georgia to Macon, Georgia, Jackson sold multi-kilogram quantities of cocaine to Reeves over an extended time frame running from 2007 to 2010. In turn, Reeves sold smaller amounts of the cocaine to lower-level distributors Joshua Smith, Moss, Leroy Hill, Sr. ("Hill Sr."), Eric Marshall, and Adrian Williams throughout this time frame. These distributors supplied cocaine to low-level dealers, including Tommy Hill, III ("Hill III"), Dara Marcus, and Charlie Seabrooks.

Between December 15, 2009 and May 5, 2010, DEA agents used video surveillance and court-ordered wiretaps to determine that Reeves was distributing as much as one-quarter kilogram of cocaine and multiple ounces of crack cocaine on a weekly basis to various "customers" in and around Macon. Law enforcement agents also learned that he used four different telephone lines, and the recorded

3

parties (including Reeves, Hill Sr., Smith, Moss, Marshall, and Jackson) were heard frequently discussing drug quantities and quality. In addition to the calls between the drug distributors, the agents intercepted seven revealing calls between Reeves and his wife, "Halcomb-Reeves."

The investigation culminated in a series of "pick-offs," or seizures of drugs and cash, just after drug transactions had taken place. Thus, for example, on May 5, 2010, authorities conducted a "pick-off" following Moss's purchase of cocaine from Reeves. Officers found 125 grams of cocaine in Moss's vehicle and large amounts of cash in Reeves's. The same day, the DEA and other state law enforcement officials executed a search warrant at 646 Mill Run Court in Macon, a home purchased by Halcomb-Reeves and her grandmother where Halcomb-Reeves, Reeves, and their son resided. The officers discovered 512.8 grams of cocaine, 23.6 grams of cocaine base, and drug paraphernalia -- including Pyrex beakers, electronic scales, and plastic bags -- concealed in a closet in the basement. They also seized 186.2 grams of cocaine, a .40 caliber Glock pistol, a Glock pistol box containing ammunition, and a box for a Browning nine-millimeter handgun from the master bedroom.

The cocaine, Glock box, and Browning box were found in a closet in the master bedroom, and the Glock pistol was found on a bedroom nightstand. The serial number on the Browning box matched the number on a handgun that law

enforcement agents had confiscated from Jackson, a co-conspirator, two years earlier. The agents also retrieved two boxes of ammunition from a kitchen drawer in the home. At the time of Reeves's and Halcomb-Reeves's arrests on August 30, 2010, they discovered another .40 caliber Glock handgun in the Halcomb-Reeves residence atop the microwave oven in the kitchen; and a magazine to the gun, Reeves's sunglasses, and Halcomb-Reeves's key chain were found next to the weapon. Halcomb-Reeves had purchased the Glock firearms for Reeves since he was prohibited from doing so as a convicted felon.

B.

On October 28, 2010, a federal grand jury in the Middle District of Georgia returned a thirteen-count second superseding indictment charging eleven co-defendants (including Reeves, Halcomb-Reeves, and Moss) with multiple narcotics and firearms offenses, as well as conspiracy to distribute cocaine from December 1, 2006 to May 5, 2010. Specifically, the indictment charged Reeves with: (1) conspiracy to possess with intent to distribute more than five kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(ii), and 846, and 18 U.S.C. § 2 (Count One); (2) possession with intent to distribute more than 50 grams of crack cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(iii), and 846, and 18 U.S.C. § 2 (Count Two)[2]; (3) possession with intent to distribute more than 500

---

[2] Count Two was titled as a second conspiracy offense, but actually charged a substantive

5

grams of cocaine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B)(ii), and 18

U.S.C. § 2 (Count Five); and (4) two counts of possession of a firearm by a

convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (Counts

Seven and Thirteen). Halcomb-Reeves was also charged in Counts One, Two, and

Five.[3] Finally, the indictment charged Moss with the conspiracy alleged in Count

One, as well as with possession with intent to distribute cocaine, in violation of 21

U.S.C. § 841(a)(1) and (b)(1)(C) and 18 U.S.C. § 2 (Count Four).[4]

Four of the co-defendants -- Romero-Diaz, Finney, Smith, and Seabrooks --

pled guilty. Six proceeded to trial, including Reeves, Halcomb-Reeves, and Moss.

Co-conspirator Eric Marshall's case was severed from the co-defendants' trial.

Over the course of the nine-day trial, the government presented extensive evidence

of the cocaine conspiracy. The law enforcement officials who conducted the

investigation, including DEA Agent Helen Graziadei, provided damning

testimony. Several cooperating co-conspirators, including Romero-Diaz, Jackson,

and Smith, also took the stand, describing the nature and extent of the narcotics

---

offense. This error was acknowledged at trial, and the jury verdict form provided for the correct
offense.

[3] Reeves and Halcomb-Reeves were charged in Count Six with possession with intent to
distribute more than five grams of crack cocaine, in violation of 21 U.S.C. § 841(a)(1) and
(b)(1)(B)(iii), and 18 U.S.C. § 2. However, the government dismissed Count Six before closing
argument.

[4] Moss was also charged in Count Two of the indictment, but the government dismissed this
count against Moss prior to trial.

conspiracy. Moreover, the government played several incriminating telephone call recordings between members of the conspiracy -- including exchanges between Reeves and Moss, as well as between Reeves and Halcomb-Reeves -- and showed accompanying video surveillance of the drug transactions, as well as photographs of the seized cocaine and firearms taken from the Halcomb-Reeves residence. At the close of the government's case, all six defendants unsuccessfully moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29.

In her defense, Halcomb-Reeves elected to take the stand and testified extensively, denying her knowledge of and participation in the conspiracy.

The jury convicted Reeves and Moss on all indicted counts. It found Halcomb-Reeves guilty of the conspiracy count but not guilty of the other charges. Following the jury's verdicts, each of the defendants renewed their motions for judgment of acquittal under Rule 29, which the district court again denied. The trial court subsequently sentenced Reeves to 360 months of imprisonment on Counts One and Five, 240 months on Count Two, 120 months on Count Seven, and 120 months on Count Thirteen, all to run concurrently. It also placed Reeves on supervised release for a term of five years following release from imprisonment, and imposed a $500 mandatory assessment fee. The court sentenced Halcomb-Reeves to 80 months of imprisonment, followed by three years of supervised release, and a $100 mandatory assessment fee. Lastly, it sentenced Moss to 87

months of imprisonment, followed by three years of supervised release, and a $200

mandatory assessment fee. Reeves, Halcomb-Reeves, and Moss each filed timely

notices of appeal.

## II.

## A.

First, both Reeves and Halcomb-Reeves claim that the evidence was

insufficient to sustain their conspiracy convictions. We review de novo a challenge

to the denial of a Rule 29 motion for a judgment of acquittal based on sufficiency

of the evidence grounds. United States v. Capers, 708 F.3d 1286, 1296 (11th Cir.

2013). We also view the evidence in a light most favorable to the jury verdict and

draw all inferences in its favor. Id. Thus, we are obliged to affirm the convictions if

a reasonable jury could have found the defendant guilty beyond a reasonable

doubt. Id. at 1297.

To sustain a conviction for conspiracy to distribute drugs in violation of 21

U.S.C. § 846, "the government must prove that 1) an agreement existed between

two or more people to distribute the drugs; 2) that the defendant at issue knew of

the conspiratorial goal; and 3) that he knowingly joined or participated in the

illegal venture." United States v. Brown, 587 F.3d 1082, 1089 (11th Cir. 2009)

(quoting United States v. Matthews, 168 F.3d 1234, 1245 (11th Cir. 1999)). In

assessing whether the record is sufficient to demonstrate the existence of a single

8

conspiracy, we consider whether a common goal existed, the nature of the underlying scheme, and the overlap of participants. United States v. Richardson, 532 F.3d 1279, 1284 (11th Cir. 2008).

It is by now axiomatic that "[p]articipation in a criminal conspiracy need not be proved by direct evidence; a common purpose or plan may be inferred from a development and collocation of circumstances." Glasser v. United States, 315 U.S. 60, 80 (1942) (internal quotation marks omitted); see United States v. Toler, 144 F.3d 1423, 1426 (11th Cir. 1998). It is also well established in this Circuit that where there are repeated transactions between participants buying and selling large quantities of illegal drugs, that may be sufficient to find the participants were involved in a single conspiracy to distribute those drugs. Brown, 587 F.3d at 1089. Moreover, a defendant may be found guilty of participating in a conspiracy if the evidence demonstrates that he was aware of its essential nature, "even if he did not know all its details or played only a minor role in the overall scheme." United States v. McNair, 605 F.3d 1152, 1195-96 (11th Cir. 2010) (quoting United States v. Guerra, 293 F.3d 1279, 1285 (11th Cir. 2002)); see also Toler, 144 F.3d at 1428 (noting that, once a drug conspiracy has been shown to exist, "a defendant can be convicted even if his or her participation in the scheme is 'slight' by comparison to the actions of other co-conspirators"). The government need not prove that a defendant participated in every stage of the conspiracy or had direct contact with

each of the other alleged co-conspirators. McNair, 605 F.3d at 1196; see United States v. Pacchioli, 718 F.3d 1294, 1303 (11th Cir. 2013).

B.

Despite Reeves's claim, there was an abundance of evidence from which a trier of fact could find him guilty of the charged conspiracy. Among the most damning pieces of evidence were recorded telephone conversations in which Reeves arranged his drug deals, as well as the testimony from five cooperating co-conspirators -- Romero-Diaz, Jackson, Seabrooks, Finney, and Smith -- describing Reeves's essential involvement in the illegal venture. Moreover, law enforcement agents testified about their search of Halcomb-Reeves's home, which yielded large amounts of cocaine and firearms near Reeves's possessions. Thus, taking the evidence in a light most favorable to the government and resolving all credibility determinations in favor of the jury's verdict, each element of the conspiracy was established: (1) an agreement among Reeves and Jackson, Finney, Smith, and Moss to distribute cocaine; (2) Reeves's knowledge of the conspiratorial goal of distributing cocaine; and (3) Reeves's extensive, knowing, and voluntary participation in the unlawful undertaking. See Capers, 708 F.3d at 1299; Brown, 587 F.3d at 1089.

Reeves's primary argument seems to be that he and the charged co-conspirators had not entered into a single criminal agreement, but rather separately

10

bought and sold cocaine in the ordinary course of several discrete agreements. But the regularity of Reeves's kilogram-quantity purchases of cocaine from Jackson, as well as his repeated cocaine sales to the same street-level distributors, provided more than an adequate foundation for the jury to find, as it did, a single overarching conspiracy to possess with intent to distribute cocaine.[5] Thus, for example, Jackson testified that, from 2007 to May 2010, he or Finney, the courier, would bring Reeves multiple kilograms of cocaine once or twice a week. And Smith testified that he bought the following quantities from Reeves: (1) in 2007, about 2.25 ounces of cocaine once a week; (2) towards the end of 2007, about 4.5 ounces of cocaine once a week; (3) in 2008, 9 ounces of cocaine a week; and (4) in 2009, about half a kilogram of cocaine every 10 to 14 days. Indeed, in the case of a purchaser of narcotics, an "agreement may be inferred when the evidence shows a continuing relationship that results in the repeated transfer of illegal drugs to the purchaser." United States v. Mercer, 165 F.3d 1331, 1335 (11th Cir. 1999). Based on extensive evidence of Reeves's long-term relationships with multiple co-conspirators and his repeated cocaine transfers, the jury could reasonably find that Reeves and the others had entered into a joint agreement. See Capers, 708 F.3d at

---

[5] The defendants asked for and the judge gave a multiple conspiracy charge to the jury, instructing the jurors that proof of several distinct conspiracies is not proof of the single conspiracy charged in the indictment, unless one of the several conspiracies is the conspiracy charged in the indictment. Moreover, the judge instructed the jurors that for them to find a defendant guilty of the conspiracy offense, they must decide that the charged conspiracy actually existed between two or more conspirators, and that the charged defendant was a member of the charged conspiracy, and not some other conspiracy.

1299-300. Moreover, having heard him on multiple calls, a rational trier of fact could readily conclude that Reeves's participation was knowing and voluntary.

Relying heavily on United States v. Glinton, 154 F.3d 1245 (11th Cir. 1998), however, Reeves claims that there was neither a common goal nor an overlap of participants sufficient to rise to the level of a single conspiracy. But unlike in Glinton, where the only thing each defendant shared was their supplier, the evidence here, taken in a light most favorable to the jury verdict, established that the co-conspirators were interdependent. See id. at 1251. Each participant played a distinct role in the charged scheme, including (1) Romero-Diaz, who supplied cocaine to Jackson; (2) Jackson, who, in turn, supplied large quantities of cocaine to Reeves over several years; (3) Reeves, who distributed cocaine to several mid-level distributors, including Hill Sr. and Smith; (4) Finney, who delivered cocaine to Reeves for Jackson; and (5) Hill Sr. and Smith, who supplied cocaine to lower-level distributors, such as Hill III, Marcus, and Seabrooks. From the extensive and complex pattern of facts adduced at trial, the jury was free to conclude (as it plainly did) that the co-conspirators all shared a common objective. In a typical drug distribution scenario like this one, "involving a large-volume seller, several mid-level distributors, and multiple street-level dealers, . . . all share the common goal of maximizing the cash returns of the business through the distribution of the drugs." United States v. Dekle, 165 F.3d 826, 829 (1999).

12

## C.

Halcomb-Reeves's sufficiency of the evidence challenge presents a closer question. As her attorney pointed out, there was nothing in the record indicating that she personally distributed drugs. The jury found her not guilty of the substantive drug offenses charged in Counts Two and Five. But the trial evidence was nonetheless sufficient to allow the jury to find beyond a reasonable doubt that she, too, knowingly and voluntarily participated in the narcotics conspiracy, albeit playing a lesser role.

For one thing, Halcomb-Reeves's recorded telephone conversations with Reeves were particularly damning. On calls from March 2 and March 4, 2010, Halcomb-Reeves informed Reeves that there were officers randomly pulling over and searching cars on the highway. Video surveillance showed, and the agents' testimony confirmed, that Reeves was engaged in drug-related activities on those very days. This evidence suggested that Halcomb-Reeves had knowledge of the cocaine conspiracy and was attempting to warn Reeves about police activity on the highway. Again, on the May 5, 2010 calls played for the jury,[6] Reeves told

---

[6] Halcomb-Reeves's claim that the May 5 recordings "cannot be considered to establish Appellant's active participation or membership in the conspiracy" is unpersuasive. "A conspiracy is deemed to have continued as long as the purposes of the conspiracy have neither been abandoned nor accomplished and the defendant has not made an affirmative showing that the conspiracy has terminated. A defendant can overcome this presumption of continued participation only by showing that he affirmatively withdrew from the conspiracy or that the final act in furtherance of the conspiracy has occurred." United States v. Harriston, 329 F.3d 779, 783 (11th Cir. 2003) (citation omitted). Here, Halcomb-Reeves has not met this burden. It was

Halcomb-Reeves that Moss had been arrested. He later said that he was "so nervous" and that he had "that shit in the house," to which Halcomb-Reeves replied, "I know." In a subsequent call, Reeves instructed Halcomb-Reeves to go home and get "that shit out of there." Halcomb-Reeves asked where it was, and after her husband described the location, she responded, "Alright." Shortly thereafter, the two agreed that Halcomb-Reeves should probably not go home at all, and Reeves told Halcomb-Reeves that he lived at an address on West Charlton Street.

Based on the telephone conversations, a reasonable jury could find that: (1) Halcomb-Reeves knew that Moss had been arrested for cocaine possession; (2) there was cocaine hidden in her house; (3) she agreed to go home and dispose of it before the police arrived; (4) she decided not to go home for fear of being arrested; and (5) she knew that Reeves was trying to get her to falsely tell the police he lived at a different address.[7] Indeed, efforts to conceal a conspiracy may support the inference that a defendant knew of the conspiracy and joined it while it was in operation. See United States v. Gold, 743 F.2d 800, 825 (11th Cir. 1984).

---

only on the second to last call on May 5 that Reeves announced that he had been pulled over by the officers and was told to wait. He informed Halcomb-Reeves that the officers were probably about to let him go, suggesting that he did not consider himself to be under arrest. But even if Reeves had been arrested, an arrest of a co-conspirator does not necessarily end the conspiracy. See United States v. Richardson, 532 F.3d 1279, 1285-86 (11th Cir. 2008).

[7] Halcomb-Reeves herself admitted on the witness stand that she lied to Agent Lisa Gigante about Reeves's real address.

14

In addition to the telephone conversations, co-conspirator Jackson offered testimony revealing that Halcomb-Reeves knew about the narcotics in her house. Jackson testified that Reeves, in the presence of Halcomb-Reeves, told him that four kilograms of cocaine had been robbed from the home, and, as a result, Jackson gave them a Browning nine-millimeter gun for their protection.[8]

Moreover, and equally important, Halcomb-Reeves opted to take the stand and testify in her defense, flatly contradicting Jackson's testimony. She admitted she bought three guns and knew many of the co-conspirators, including Jackson, Marshall, Hill III, Hill Sr., Finney, Moss, and Smith. But she denied knowing that Reeves and Jackson were in the drug business, that her house had ever been robbed, and that she had ever seen the Browning gun. Halcomb-Reeves also offered wholly innocent explanations of her recorded March and May telephone conversations with Reeves. But the jury, hearing Halcomb-Reeves's words and seeing her demeanor, was free to discredit her testimony, and, in fact, to believe the opposite of what she had said. See United States v. Brown, 53 F.3d 312, 314 (11th Cir. 1995). Quite simply, her testimony was substantive evidence the jury could fairly consider in reaching a judgment about her knowing participation in the charged drug conspiracy.

---

[8] This gun was subsequently returned to Jackson and, as previously noted, confiscated by law enforcement.

Furthermore, a reasonable jury could infer Halcomb-Reeves's knowing participation in the conspiracy from the fact that she had been married to one of the conspiracy's ringleaders since 2009, had lived with him since 2006, and substantial quantities of drugs, along with drug paraphernalia and firearms, were found in her home. See United States v. Garcia, 447 F.3d 1327, 1338 (11th Cir. 2006) (noting that fact that defendant lived in "house full of drugs" and "was related through his common-law marriage" to conspiracy's ringleader supported defendant's conspiracy conviction). Law enforcement officers Lisa Gigante, Mike Jones, Dell Cole, and Brian Hammock testified that cocaine and drug equipment were found in areas that were readily visible, including in the master bedroom closet and in a closet in the basement. Indeed, they testified they seized plastic bags containing over 500 grams of cocaine, Pyrex beakers, electronic scales, and plastic containers from the closets. A forensic chemist determined that the seized cocaine weighed approximately 722 grams. The seizure of large quantities of cocaine and drug paraphernalia from Halcomb-Reeves's master bedroom and from her basement provided an additional foundation on which the jury could find that Halcomb-Reeves had knowingly participated in the conspiracy. See United States v. Molina, 443 F.3d 824, 829 (11th Cir. 2006). Finally, the government presented financial evidence from which the jury could determine that Halcomb-Reeves was relying on the proceeds of Reeves's drug sales to pay her bills, since the record established

16

that Halcomb-Reeves's monthly bills inexplicably far exceeded her reported monthly income. Cf. United States v. Knowles, 66 F.3d 1146, 1156-57 (11th Cir. 1995) (noting that "a defendant's knowing possession of a large sum of money may be considered evidence that the defendant knew the object of the conspiracy").

In short, the corpus of evidence presented against Halcomb-Reeves, while nowhere near as overwhelming as the case presented against Reeves, was sufficient to sustain a jury verdict.

### III.

Halcomb-Reeves also challenges several of the district court's evidentiary rulings. We are persuaded by none of them. We review a district court's decision to admit or exclude evidence for abuse of discretion. Capers, 708 F.3d at 1305. Moreover, "[e]ven where an abuse of discretion is shown, non-constitutional evidentiary errors are not grounds for reversal absent a reasonable likelihood that the defendant's substantial rights were affected." Id. (quoting United States v. Range, 94 F.3d 614, 620 (11th Cir. 1996)).

### A.

Halcomb-Reeves insists that the district court abused its discretion in admitting seven recorded telephone calls. Specifically, she claims the calls were

17

improperly authenticated, and the government erred in bolstering the testimony of the agent who identified her voice on the recordings.

In order to introduce a recording at trial, the government must establish that it "is an accurate reproduction of relevant sounds previously audited by a witness." United States v. Biggins, 551 F.2d 64, 66 (5th Cir. 1977).[9] Plainly, the government carries the burden of proving: (1) the competency of the operator; (2) the fidelity of the recording equipment; (3) the absence of material deletions, additions, or alterations in the relevant portions of the recording; and (4) the identification of the relevant speakers. Id. But even if one or more of these requirements has not been satisfied, "[i]f there is independent evidence of the accuracy of the tape recordings admitted at trial, we shall be extremely reluctant to disturb the trial court's decision" to admit the recording. Id. at 67. The district court has "broad discretion in determining whether to allow a recording to be played before the jury," id. at 66, and its determination of authenticity should not be disturbed unless "there is no competent evidence in the record to support it." United States v. Munoz, 16 F.3d 1116, 1120-21 (11th Cir. 1994) (quoting United States v. Caldwell, 776 F.2d 989, 1001 (11th Cir. 1985)) (emphasis added). We add that under the Federal Rules of Evidence, "[a]n opinion identifying a person's voice -- whether heard firsthand or

---

[9] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.

through mechanical or electronic transmission or recording -- based on hearing the voice at any time under circumstances that connect it with the alleged speaker" can satisfy Rule 901(a). Fed. R. Evid. 901(b)(5); see United States v. Cuesta, 597 F.2d 903, 915 (5th Cir. 1979).

Here, the district court did not abuse its considerable discretion in admitting the recordings because there was sufficient evidence establishing Halcomb-Reeves's identity. In the first place, the government authenticated the recordings through the testimony of Smith, a co-conspirator who identified Halcomb-Reeves's voice, coupled with Halcomb-Reeves's own admission that she had met Smith before.[10] It was up to the jury to determine the weight to place on this identification. Cuesta, 597 F.2d at 915. Moreover, Agent Graziadei's "opinion identifying [Halcomb-Reeves's] voice" -- based on her experience in the case, Smith's prior identification, and listening to the wiretap recordings -- was permissible under Fed. R. Evid. 901(b)(5). But, in any event, Halcomb-Reeves herself confirmed that the telephone recordings were actually between Reeves and herself when she testified about what she termed wholly innocent conversations. Thus, for example, after the March 2, 2010 call was played for the jury during Halcomb-Reeves's direct examination, Halcomb-Reeves's counsel asked her, "So

---

[10] At trial, Halcomb-Reeves acknowledged that she had met Smith at a party, where she was introduced to him as "Mike's wife."

19

what were you asking Michael about that morning?" Halcomb-Reeves responded, "Was Brandon okay." Counsel then asked, "Why were you calling him to ask him about that?" Even if the government had not carried its burden under <u>Biggins</u> -- and we think it did -- Halcomb-Reeves's testimony undeniably constituted "sufficient independent evidence" of the identification of the speakers on the recordings. <u>See</u> <u>United States v. Hughes</u>, 658 F.2d 317, 323 (5th Cir. Unit B Oct. 1981).

Nor are we persuaded by Halcomb-Reeves's claim that the government improperly bolstered the testimony of Agent Graziadei. She says that the government's reference to Graziadei as an expert and the proffered information about the agent's experience -- two days before the government asked the agent to identify Halcomb-Reeves's voice for the jury -- improperly bolstered the voice identification testimony. Improper bolstering occurs when the government places its prestige behind the witness, or when the government suggests that information not presented to the jury actually supports the witness's credibility. <u>United States v. Bernal-Benitez</u>, 594 F.3d 1303, 1313-14 (11th Cir. 2010). Merely explicating Graziadei's qualifications as an agent and her role in the case is a far cry from bolstering. The challenged remarks were not improper.

B.

20

Halcomb-Reeves also claims that the district court abused its discretion by admitting Jackson's testimony concerning Reeves's statement about an alleged robbery pursuant to Fed. R. Evid. 801(d)(2)(E). Again, we are not persuaded. At trial, Jackson, a co-conspirator, testified that, in November 2007, Reeves informed him that four kilograms of cocaine had been robbed from the Reeves home, and as a result, Jackson loaned Reeves the Browning nine-millimeter gun for his protection. Jackson further testified that Halcomb-Reeves was present when Reeves told him about the theft.

Under the Federal Rules of Evidence, statements of co-conspirators made during the course of and in furtherance of the conspiracy are not hearsay. Fed. R. Evid. 801(d)(2)(E). For a statement to be admissible under Rule 801(d)(2)(E), the government must prove by a preponderance of the evidence that: "(1) a conspiracy existed; (2) the conspiracy included the declarant and the defendant against whom the statement is offered; and (3) the statement was made during the course and in furtherance of the conspiracy." United States v. Magluta, 418 F.3d 1166, 1177-78 (11th Cir. 2005) (quoting United States v. Hasner, 340 F.3d 1261, 1274 (11th Cir. 2003)). Here, Halcomb-Reeves only challenges the second requirement. But, as we've already observed, there was sufficient evidence that Halcomb-Reeves knew that Reeves was involved in the cocaine business and actively helped him conceal his drug activity from the police. The evidence was sufficient to allow the district

21

court to find by a preponderance of the evidence that the charged conspiracy included Reeves, Halcomb-Reeves, and Jackson, and that the offending comment was made in the course and in furtherance of the conspiracy.

Halcomb-Reeves claims, however, that she was not a member of the alleged conspiracy at the time of the purported conversation between Reeves and Jackson. But a co-conspirator's declaration made in the course and in furtherance of a conspiracy is admissible against a co-conspirator, even one who may have joined the conspiracy after the statement was made. United States v. Tombrello, 666 F.2d 485, 491 (11th Cir. 1982). Finally, Halcomb-Reeves says that the proffered statement is inadmissible against her because she was not present when the discussion between her husband and Jackson took place. The first problem with the claim is that Jackson testified that Halcomb-Reeves was present, and the jury was free to believe his testimony over hers. Moreover, her presence at the time of the statement need not be proven for the evidence to have been admissible. See Fed. R. Evid. 801(d)(2)(E); Magluta, 418 F.3d at 1177-78. Her presence would only affect the weight the jury may afford the evidence.

## C.

Halcomb-Reeves also claims that Agent Gigante, who questioned her on May 6, 2010 after Reeves had been arrested, improperly commented on her right to remain silent. At trial, the following offending exchange occurred:

Prosecutor: Okay. And what, if anything, did you ask? Or how did the interview go? Can you tell us what [Halcomb-Reeves] said?

Agent Gigante: She said that she had been employed at Central State Hospital for three years and that she lives at the 646 Mill Run Court, and she had lived there for two years, and she owns the residence. She said she was married to Michael Reeves. . . . And she said, I'm not lying. He doesn't live with me. . . . And I said, well, if you're the only adult living in that house, then I guess the cocaine and the gun that we found when we did the search warrant must be yours. And at that point [Halcomb-Reeves] hesitated for a minute, and she said, well, I think I might need to talk to a lawyer and so --.

Halcomb-Reeves's Counsel: Objection, Your Honor. May we approach?

The Court: You may.

The district court subsequently denied Halcomb-Reeves's motion for a mistrial, but offered to give a curative instruction. Halcomb-Reeves's counsel declined the invitation.

We review for abuse of discretion a refusal to grant a mistrial based on a comment regarding a defendant's right to remain silent. United States v. Chastain, 198 F.3d 1338, 1351 (11th Cir. 1999). "A trial judge has discretion to grant a mistrial since he . . . is in the best position to evaluate the prejudicial effect of a statement or evidence on the jury." United States v. Delgado, 321 F.3d 1338, 1346-47 (11th Cir. 2003) (internal quotation marks omitted).

In Doyle v. Ohio, 426 U.S. 610, 619 (1976), the Supreme Court held that the use of a defendant's silence at the time of his arrest for impeachment purposes

23

violates due process because warnings pursuant to Miranda v. Arizona, 384 U.S. 436 (1966), carry an implicit assurance that silence will carry no penalty. The Court later extended this protection to post-Miranda invocations of the right to counsel. Wainwright v. Greenfield, 474 U.S. 284, 295 (1986). "A Doyle violation is harmless if the error had no substantial and injurious effect or influence in determining the jury's verdict." United States v. Miller, 255 F.3d 1282, 1285 (11th Cir. 2001) (internal quotation marks omitted). The error is "especially [harmless when] the prosecutor makes no further attempt to 'highlight' the defendant's exercise of Miranda rights either in questioning other witnesses or during closing argument." Id. at 1286.

The government may comment on a defendant's silence if it occurred before the defendant was in custody and given Miranda warnings. United States v. Rivera, 944 F.2d 1563, 1568 (11th Cir. 1991); see Jenkins v. Anderson, 447 U.S. 231, 239-40 (1980). Here, Halcomb-Reeves mentioned her need for a lawyer when she was participating in a consensual interview at her sister's home; she was not in custody or under arrest at the time. Unsurprisingly, the record is wholly devoid of evidence that Halcomb-Reeves had been advised of her Miranda rights at the time she spoke with Agent Gigante. But even if Agent Gigante had commented on Halcomb-Reeves's post-Miranda silence, the district court acted well within its discretion in denying her a mistrial based on the comment.

24

The sequence of events here -- the prosecutor's open-ended question, Agent Gigante's brief mention of Halcomb-Reeves's invocation, and the immediate objection -- resembles exchanges in cases where we have found no Fifth Amendment violations. See United States v. Baker, 432 F.3d 1189 (11th Cir. 2005); Chastain, 198 F.3d 1338. Thus, for example, in Chastain, an officer referenced the defendant's silence in answering an open-ended question by the prosecutor about his investigation. Chastain, 198 F.3d at 1351. We held that the agent did not manifestly intend to comment on the defendant's exercise of his privilege not to testify, and the jury would not necessarily take the agent's answer to be a comment on the defendant's failure to testify. Id. at 1351-52. Here, Agent Gigante was generally responding to an open-ended question about her discussion with Halcomb-Reeves. Any reference to Halcomb-Reeves's mention of her right to counsel does not appear to have been intended to be a comment on her exercise of the right to remain silent. At sidebar, the government itself stated, "[O]f course, I didn't know she was going there. . . . We had talked about it beforehand, but it was some time ago that I talked with her about it and so she may have forgotten."

As we observed in Baker, a single, inappropriate reference to a defendant's post-arrest silence that is not mentioned again is too brief to constitute a Fifth Amendment violation. Baker, 432 F.3d at 1222. Like the witness in Baker, Agent Gigante only referred to Halcomb-Reeves's request for a lawyer once, and the

25

government made no further inquiry or argument about the statement. In short, even if Gigante actually had referenced Halcomb-Reeves's post-<u>Miranda</u> silence, the inadvertent comment was "harmless" and did not warrant a mistrial.

Halcomb-Reeves also argues that the cumulative effect of the district court's evidentiary rulings warrants reversal of her conviction. Under the cumulative-error doctrine, we will reverse a conviction where an aggregation of non-reversible errors yields a denial of the constitutional right to a fair trial. <u>Capers</u>, 708 F.3d at 1299. But the district court did not commit any error concerning the recorded telephone calls or the admission of Jackson's testimony. Agent Gigante's testimony about Halcomb-Reeves's invocation of her right to a lawyer was, at worst, and only arguably, a single, harmless error. Plainly, this is insufficient to support a cumulative error argument. <u>See</u> <u>United States v. Gamory</u>, 635 F.3d 480, 497 (11th Cir. 2011) (noting that if there are no errors or only a single error, there can be no cumulative error).

IV.

Finally, Moss appeals his conspiracy conviction claiming that the government deliberately and repeatedly misstated facts in its closing argument. To find prosecutorial misconduct, a two-element test must be met: "(1) the remarks must be improper, and (2) the remarks must prejudicially affect the substantial rights of the defendant." <u>United States v. Gonzalez</u>, 122 F.3d 1383, 1389 (11th Cir.

26

1997) (quoting United States v. Eyster, 948 F.2d 1196, 1206 (11th Cir. 1991)). "A defendant's substantial rights are prejudicially affected when a reasonable probability arises that, but for the remarks, the outcome of the trial would have been different." United States v. Eckhardt, 466 F.3d 938, 947 (11th Cir. 2006). We generally consider four factors: (1) whether the challenged comments had a tendency to mislead the jury or prejudice the defendant; (2) whether the comments were isolated or extensive; (3) whether the comments were deliberately or accidentally placed before the jury; and (4) the strength of the competent proof establishing the guilt of the defendant. United States v. Lopez, 590 F.3d 1238, 1256 (11th Cir. 2009). A prosecutor's comments in closing statement must be viewed in the context of the trial as a whole. United States v. Bailey, 123 F.3d 1381, 1400 (11th Cir. 1997). The purpose of closing argument is to assist the jury in analyzing the evidence, and although a prosecutor may not exceed the evidence presented at trial during her closing argument, she may state conclusions drawn from the trial evidence. Id. Additionally, "the prosecutor, as an advocate, is entitled to make a fair response to the arguments of defense counsel." United States v. Sarmiento, 744 F.2d 755, 765 (11th Cir. 1984) (quotation and alteration omitted). Thus, issues raised by a defendant in closing argument are "fair game for the prosecution on rebuttal." Id.

Having reviewed this record, we can discern no reversible error based on the prosecutor's closing argument. Of the six comments that Moss challenges on appeal, three were not improper because the government was merely drawing conclusions from the trial evidence. These three remarks included the government's use of a hand-drawn wheel diagram to explain the relationship between the defendants, its statement that two of the co-conspirators (Hill Sr. and Marcus) had a pre-existing relationship, and its assertion that "seven or eight," as used in a telephone call between Hill Sr. and Reeves, referred to ounces. The other three cited errors -- a misstatement that jurors must consider Halcomb-Reeves's testimony in the same way they assess a cooperating co-conspirator's testimony, an incorrect statement that Hill III's counsel referenced facts not in evidence during his closing argument, and an inaccurate attribution of two kilograms of cocaine to Moss -- could be deemed improper. But they do not affect Moss's substantial rights because there isn't a reasonable probability that, but for the remarks, the outcome of his trial would have been different. Indeed, the cocaine attribution misstatement is the only mistake that even potentially could have implicated Moss. And the government quickly corrected the error, clarifying that it was Romero-Diaz who had been in possession of two kilograms and properly attributing only 124 grams of cocaine to Moss.

28

Furthermore, any error in the prosecutor's comments was harmless because the record contains sufficient independent evidence of Moss's guilt concerning the conspiracy charge, including the presentation of several recorded conversations between Moss and Reeves discussing cocaine purchases. Moreover, the court cured all of the complained-of remarks through its jury instructions. See Lopez, 590 F.3d at 1256 (finding that if the district court takes a curative measure in response to prosecutorial misconduct during closing arguments, a court of appeals will reverse only if the evidence is so prejudicial as to be incurable by that measure). Moss has not come close to establishing that the closing argument was so highly prejudicial as to be incurable by the court's instructions. The improper comments did not prejudicially affect Moss's substantial rights, and the district court did not abuse its discretion by refusing to grant a mistrial.

## V.

In addition to challenging the sufficiency of the evidence, Reeves contends that the district court erred by attributing at least 150 kilograms of cocaine to him at sentencing. We review for clear error a district court's determination of drug quantity. United States v. Almedina, 686 F.3d 1312, 1315 (11th Cir. 2012). The government must establish drug quantity by a preponderance of the evidence. Id. When the amount of the drugs seized does not reflect the scale of the offense, the district court must approximate the drug quantity attributable to the defendant. Id.

at 1315-16; see United States v. Frazier, 89 F.3d 1501, 1506 (11th Cir. 1996). In estimating the quantity, the trial court may rely on evidence demonstrating the average frequency and amount of a defendant's drug sales over a given period of time. Frazier, 89 F.3d at 1506. "This determination may be based on fair, accurate, and conservative estimates of the drug quantity attributable to a defendant, [but it] cannot be based on calculations of drug quantities that are merely speculative." Almedina, 686 F.3d at 1316 (quoting United States v. Zapata, 139 F.3d 1355, 1359 (11th Cir. 1998) (per curiam)).

The foundation for the district court's calculation of drugs at sentencing was neither "vague" nor "uncertain." See United States v. Simpson, 228 F.3d 1294, 1301 (2000). Jackson testified that he sold Reeves the following specific amounts: (1) in 2007, between five to ten kilograms of cocaine a week; (2) in 2008, ten kilograms of cocaine a week; (3) in 2009, three kilograms of cocaine twice a week; and (4) in 2010, three kilograms of cocaine, once or twice a week. At sentencing, the district court analyzed this evidence, observing that although the Presentence Investigation Report attributed an approximate minimum of 883 kilograms of cocaine to Reeves, "the real relevant issue" was simply whether a preponderance of the evidence supported a quantity of more than 150 kilograms.[11] And the court found that it did, even accepting that Jackson may have "exaggerated somewhat."

---

[11] Under the Sentencing Guidelines, a defendant's base offense level is 38 -- the highest level

30

The district court acknowledged that there were arguably inconsistencies in Jackson's account, took them into consideration at the sentencing hearing, and discussed Jackson's trial testimony at length. Having conducted both the trial and the sentencing, the district court was in the best position to make credibility choices among various pieces of testimony regarding the quantity of drugs involved in a conspiracy. See United States v. Alred, 144 F.3d 1405, 1417 (11th Cir. 1998) (finding no clear error when the district court judge relied on a grand jury witness's testimony of quantity over a different witness's trial testimony of quantity). Indeed, where there are two acceptable views of the evidence, the factfinder's choice cannot be clearly erroneous. United States v. Izquierdo, 448 F.3d 1269, 1278 (11th Cir. 2006). A preponderance of the evidence showed that Reeves was responsible for well in excess of 150 kilograms of cocaine, and Reeves has failed to demonstrate why "great deference" should not be accorded to this factual determination. United States v. Gregg, 179 F.3d 1312, 1316 (11th Cir. 1999).[12]

---

available -- if the offense involves 150 kilograms or more of cocaine. U.S.S.G. § 2D1.1(c)(1).

[12] Reeves's written judgment contains several scrivener's errors. We may sua sponte raise the issue of clerical errors in a judgment and remand with instructions that the district court correct them. See United States v. Massey, 443 F.3d 814, 822 (11th Cir. 2006) (remanding with directions for the district court to correct the clerical error where the judgment listed the correct crime, but incorrectly listed the corresponding indictment count). Count One of the written judgment should be corrected to reflect the offense of conspiracy to possess with intent to distribute more than five kilograms of cocaine, in violation of 21 U.S.C. § 846 in connection

Accordingly, we affirm Reeves's, Halcomb-Reeves's, and Moss's convictions and sentences. But we remand for the limited purpose of correcting the scrivener's errors in Reeves's written judgment.

AFFIRMED; AND REMANDED IN PART.

---

with § 841(a)(1) and (b)(1)(A)(ii), as charged in the second superseding indictment and as found by the jury. Count Two of the written judgment should be amended to reflect the offense of possession with intent to distribute more than five, but less than 50, grams of crack cocaine, as charged in the indictment and as found by the jury, in violation of 21 U.S.C. § 841(a)(1) and (b). The correction of these clerical errors "would not prejudice [Reeves] in any reversible way." United States v. Diaz, 190 F.3d 1247, 1252 (11th Cir. 1999).