[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 22-11323

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

RICARDO FERGILE,
a.k.a. Dave,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:19-cr-20633-CMA-2

_____

Before WILLIAM PRYOR, Chief Judge, and NEWSOM and BRASHER, Circuit Judges.

PER CURIAM:

Ricardo Fergile appeals his sentence of 192 months of imprisonment for conspiring to import cocaine, 21 U.S.C. § 963. Fergile argues that the district court clearly erred in determining the drug quantity attributable to him at sentencing. We affirm.

A grand jury indicted Fergile for conspiring to import cocaine, *id.* § 963, importing cocaine, *id.* § 952(a), conspiring to possess with intent to distribute cocaine, *id.* § 846, and possessing with intent to distribute cocaine, *id.* § 841(a)(1). At trial, Johny Telfort testified that, after his friend Joel Exume recruited him to work for a drug-trafficking organization in Haiti, Telfort began working with the Drug Enforcement Agency as a confidential informant. Telfort recorded meetings with members of the organization, including Fergile and a woman called "Sexyliline." Telfort identified Fergile as "the boss," specifically Exume's boss.

Telfort testified that he when met "Sexyliline," she was driving and had two cocaine packages near her. Telfort stated that the packages were thicker and "a little bit longer than [his] Samsung phone" and had an emblem of two crossed rifles with the inscription "Diamante de Colombia." "Sexyliline" drove to an alley and received a bag from another car through the window, which she handed to Exume who then poured "about 20, 25" rolled packs of

cash from the bag into a different bag. "Sexyliline" then placed the cocaine into the empty bag and returned the bag to the other car.

Telfort testified that Exume and "Sexyliline" began pressuring him to smuggle cocaine. After he turned down a request to travel, he received a voicemail from "Sexyliline" who said, "This Friday, Joel [Exume] is sending someone [else] to give it for him." In a recorded conversation, Exume tried to put Telfort at ease by telling him that a "football player," which was code for a smuggler, recently took a successful trip and that Exume had traveled with drugs three times without an issue. Exume told Telfort that he received a commission when his couriers smuggled cocaine.

Telfort told Exume that before he would agree to smuggle cocaine, he wanted to talk to the boss of the organization. Exume and Fergile later drove to Telfort's house and picked him up. In the car, Fergile received a phone call from his boss about finding a "thief." They met up with Fergile's boss, and Fergile put the thief in the car with Telfort and Exume. They drove three hours to where the thief said he had hidden the drugs. Fergile recovered about "seven brick-shaped packages" of cocaine that were identical with the ones that he saw in "Sexyliline's" car because the packages bore a crossed-rifle emblem and the inscription "Diamante de Colombia." Law enforcement retrieved the bag that had held the cocaine packages.

Telfort testified that after Fergile started a fire in his home to pressure him into traveling, Telfort agreed to smuggle cocaine. Fergile offered him a courier's fee of $5,000 plus expenses. Fergile

purchased the plane ticket and supplied a suitcase that was packed with cocaine. Before Telfort traveled, Fergile asked a co-conspirator "Steve" to tell Telfort about how Steve's brother had made at least 15 successful trips for the organization. Upon arriving in Fort Lauderdale with the suitcase, Telfort followed instructions from the government to leave the suitcase at the airport.

A customs officer testified that Antoine Lubin, another co-conspirator, picked up the suitcase and that the suitcase contained two packages of cocaine. Fergile and the government stipulated that the suitcase contained 2.4 kilograms of cocaine. Lubin testified that his job was to watch over people who traveled with drugs for the organization, and he was paid to travel with and watch over Telfort on his first trip. Lubin was paid $1,000 for each trip and had worked on three deals for the organization. It was Fergile's job to supply and prepare suitcases for the couriers. Although Lubin did not know the amount of drugs that Fergile packed into the suitcases, on the night before his first trip as a watcher he saw Fergile pack a suitcase with two bags of cocaine

Derek Sousa, an expert in international narcotics trafficking, testified that the wholesale price of Colombian cocaine was between $1,000 and $3,000 per kilogram. At the time of trial, the price of the same kilogram of cocaine ranged from $12,000 to $13,000 in Haiti, and from $23,000 to $40,000 in the United States. The jury found Fergile guilty of conspiring to import cocaine, 21 U.S.C. § 963, in an amount between 500 grams and five kilograms, but acquitted him of the other counts.

Fergile's presentence investigation report provided a base offense level of 32 because he was accountable for at least 18.4 kilograms of cocaine, U.S.S.G. § 2D1.1(c)(4). The report applied enhancements for possessing a firearm, *id.* § 2D1.1(b)(1), and his role in the organization, *id.* § 3B1.1(b). With a total offense level of 37 and a criminal history category of I, Fergile's advisory sentencing range was 210 to 262 months of imprisonment. Fergile objected to the base offense level because it was based on a higher weight of cocaine than the jury found.

At sentencing, the government argued that it had proved that the conspiracy involved more than 15 kilograms of cocaine. The parties stipulated that Telfort's suitcase contained 2.4 kilograms of cocaine, and audio recordings and transcripts referenced five trips—one trip made by a courier who "Sexyliline" told Telfort was sent in his place after he refused to travel, three trips that Exume made on his own, and one trip that Exume said was made by a "football player." Lubin testified about taking two additional trips as a "watcher." Telfort also testified about seeing "Sexyliline" exchange two packages of cocaine and seeing Fergile retrieve seven packages of stolen cocaine, which, in total, was at least seven trips and nine packages of cocaine, plus the suitcase that contained 2.4 kilograms. The government argued that, based on the arrests of other couriers for the organization, the average courier carried between 1.6 and 3.5 kilograms of cocaine. The government contended that the weight likely remained consistent within this range because Fergile was responsible for supplying and preparing the suitcases. The government argued that packing the suitcases with

less than one kilogram would not have been worth the expense of flights and travel costs, the courier's fee, the watcher's fee, and the recruiter's commission, in addition to profits for the organization. The government argued that an estimate of 1.6 kilograms per package and per trip was reasonable, but that even a conservative estimate of one kilogram per package and trip, plus the 2.4-kilogram airport seizure, yielded over 15 kilograms.

The district court ruled that the government proved by a preponderance of the evidence that Fergile was responsible for at least 18.4 kilograms of cocaine. The district court sentenced him to 192 months of imprisonment.

We review the determination of drug quantity attributable to a defendant for clear error. *United States v. Reeves*, 742 F.3d 487, 506 (11th Cir. 2014). For a finding to be clearly erroneous, we "must be left with a definite and firm conviction that a mistake has been committed." *United States v. Almedina*, 686 F.3d 1312, 1315 (11th Cir. 2012). The government must establish drug quantity by a preponderance of the evidence. *Id.* This standard "requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence" and must be supported by reliable and specific evidence. *Id.*

"When the amount of the drugs seized does not reflect the scale of the offense, the district court must approximate the drug quantity attributable to the defendant." *Reeves*, 742 F.3d at 506. To make this determination, the district court "may consider, for example, the price generally obtained for the controlled substance,

financial or other records, [and] similar transactions in controlled substances by the defendant . . . ." U.S.S.G. § 2D1.1 cmt. n.5 (2021). The district court may also rely on evidence of the amount and frequency of a defendant's drug activities if it is based on "fair, accurate, and conservative estimates of the drug quantity attributable to a defendant, [but it] cannot be based on calculations of drug quantities that are merely speculative." *Reeves*, 742 F.3d at 506 (alteration in original).

The district court did not clearly err in its finding that the government established by a preponderance of the evidence that Fergile was responsible for at least 18.4 kilograms of cocaine. The district court agreed with and implicitly adopted the calculation by the government. That calculation was supported by Telfort's testimony and audio recordings that, during the course of the conspiracy, at least seven drug-smuggling trips were made and at least nine packages of cocaine were involved, in addition to the 2.4 kilograms of cocaine found during the airport seizure.

Fergile argues that, as in *United States v. Butler*, the district court clearly erred by relying on the 2.4-kilogram airport seizure as a representative proxy for all of the other trips and packages. 41 F.3d 1435 (11th Cir. 1995). We held in *Butler* that the district court erred by making insufficient findings on the drug quantity that the defendants distributed by adopting the presentence investigation report without hearing testimony or argument about what quantity was reasonably foreseeable by each defendant. *Id.* at 1446–48. The government estimated the drug quantity by reviewing

surveillance video from one day of the conspiracy, counting the number of drug transactions that occurred during a four-hour period on that day, and extrapolating that number of transactions to each day of a two-month conspiracy. We concluded that more specific findings were needed because the record revealed no evidence that the day that was chosen was a reliable proxy for all days of the conspiracy, which was a "vital prerequisite" to finding the method reliable. *Id.*

Unlike in *Butler*, the district court did not use a snapshot of an amount captured on a single day or trip and extrapolate that amount to each day of the conspiracy. The district court relied on testimony about nine specific packages and seven specific trips. The weight of the packages was supported by Telfort's testimony that each one was packaged identically bearing the same crossed-rifle emblem and inscription "Diamante del Colombia." Telfort testified that the two packages exchanged by "Sexyliline" were longer and thicker than a cell phone, and the seven packages of stolen cocaine were "brick-like." Telfort also saw two packages being exchanged for "20, 25" rolled packs of cash, and the narcotics trafficking expert testified that one kilogram sold for $12,000 or $13,000 in Haiti, which gave rise to the reasonable inference that each package weighed approximately one kilogram.

The district court did not clearly err by determining that it was more likely than not that each drug-smuggling trip involved at least one kilogram of cocaine. Telfort and Lubin testified that Fergile was responsible for packing and providing the suitcases to his

couriers, which fairly supported the inference that Fergile packaged the suitcases similarly and with a comparable amount of cocaine. Although the government asserted that previous stops revealed between 1.6 and 3.5 kilograms per trip and that 1.6 kilograms was a reasonable estimate that would avoid inflating Fergile's sentence based on a high aberration, the district court made a conservative finding of one kilogram per trip. As the government argued, it was more probable than not that each suitcase contained at least one kilogram because a lesser amount would be unprofitable after paying the various costs of smuggling, including flights and travel expenses, the courier's $5,000 fee, the watcher's $1,000 fee, and the recruiter's commission. Viewing the evidence as a whole, we are not left with a definite and firm conviction that the district court made a mistake in finding that Fergile was responsible for at least 15 kilograms of cocaine. *See Almedina*, 686 F.3d at 1315.

Fergile argues that the district court was constitutionally prohibited from sentencing him based on conduct of which he was acquitted and that it was constrained by the finding of the jury, but this argument fails. The jury verdict reflected its finding that a drug quantity in excess of five kilograms had not been proved beyond a reasonable doubt, but the government bore a lighter burden at sentencing. And, as Fergile concedes, our precedent is well established that district courts may consider acquitted conduct in sentencing, so long as the government proves the conduct in question by a preponderance of the evidence and the sentence imposed does not exceed what is authorized by the jury verdict. *United States v. Culver*,

598 F.3d 740, 752-53 (11th Cir. 2010); *see United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008).

We **AFFIRM** Fergile's sentence.