[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-10435
Non-Argument Calendar

_____

D.C. Docket No. 9:13-cr-80173-KAM-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JOSEPH PAUL ZADA,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(August 11, 2017)

Before MARTIN, ROSENBAUM, and ANDERSON, Circuit Judges.

PER CURIAM:

After a lengthy jury trial, Joseph Zada was convicted of fifteen counts of

mail fraud, in violation of 18 U.S.C. § 1341, for operating a scheme to defraud

investor-victims of tens of millions of dollars over a period of more than ten years. Zada makes the following claims on appeal: (1) the district court abused its discretion in admitting a recorded conversation made by a government witness that contained gaps in the recording; (2) the court abused its discretion in excluding certain exhibits as inadmissible hearsay; and (3) the court clearly erred in applying a four-level role enhancement to Zada's sentence, pursuant to U.S.S.G. § 3B1.1(a), for operating a scheme that was "otherwise extensive." After careful review, we affirm.

## I. Background

### A. The Fraudulent Scheme

Zada was convicted following a 22-day jury trial. The evidence introduced at trial established that Zada operated a scheme to defraud investors of tens of millions of dollars from approximately 1997 through 2013. Although Zada does not challenge the sufficiency of the evidence to support his convictions, we recount some of the evidence to give context to his arguments on appeal.

Broadly speaking, Zada used his appearance of extravagant wealth and exclusive connections to Middle Eastern oil ventures to solicit investments from individuals in Florida, Michigan, and elsewhere. Zada represented that investors could earn high returns by investing through him with a secret board in London, and he encouraged investors to invest as much money as possible, even if it meant

2

mortgaging a home or borrowing money. While the investors believed that Zada was investing their money in oil ventures or other foreign investments, Zada instead used much of the money to furnish his lavish lifestyle.

Zada cultivated potential investors by hosting extravagant parties, inviting them to one of his lavish homes, or purchasing expensive items from them, such as exotic cars or jewelry. He also told investors that he wanted to help them out either because they were "like family" or because they were public servants, like firefighters. And although he said that the investment was exclusive, he sometimes encouraged investors to invite their family and friends to join in.

In return for their investments, many investors received "promissory notes," which Zada said were a way to guarantee their principal in case something happened to him. For the same reason, Zada encouraged investors to write "loan" on their checks and wire transfers to him.

To maintain the appearance of legitimacy, Zada apprised the investors of their quarterly returns, which generally exceeded 10%. Zada also paid out purported returns to some of the investors, but he discouraged investors from withdrawing their principal. He introduced some investors to his purported connections to the secret board (a man known as Wolfgang) and to the Saudi royal family (a name named Mohamed Zarrouk). And he enlisted attorneys to correspond with investors who wanted to cash out their investments.

3

When investors asked for the return of their investments, Zada and his attorneys made excuses about why the money was not available and assured them that it would be coming soon. Both Zada and his attorneys gave assurances to investors that they would soon be paid back because he was going to receive an inheritance in excess of $250 million. For example, a jeweler who had asked for the return of his investment received a letter from an attorney representing Zada, which stated in part,

> [Zada] has asked me to provide you some information concerning a large inheritance he will receive from a deceased individual. I have been working on this inheritance for over two years. I have seen independent documentation to support the information [Zada] has provided. I also have in my possession a letter and financial statement from an internationally recognized accounting firm stating that the value of the assets to which [Zada] will be entitled as a result of the inheritance are far in excess of $250 million. . . . [The law firm] is currently engaged in discussions that will lead to [Zada] actually receiving the inheritance, which hopefully will not be too far in the future.

At some point in 2007, Zada began telling investors that he would be closing out the investments. Over the course of the next two years, Zada sent the investors agreements for satisfaction of debt and release, promising to make payments that were never made. He sent checks allegedly to return the investors' principal plus interest, usually with the caveat that they should wait for Zada's authorization to deposit the checks. But either he never gave his authorization or, if the checks were deposited anyway, the bank did not honor the checks for insufficient funds.

4

Later on, Zada entered into agreements wherein he consented to the immediate entry of a judgment in favor of the investor if he failed to pay an agreed-upon lump sum by a certain date.  Again, Zada failed to make the promised payments.

## B.    The Government's Evidence

The government proved its case primarily through the testimony of numerous victims, who presented consistent testimony about their experiences and transactions with Zada.  The government's case-in-chief also included two oral recordings of Zada.  The first recording was a message Zada left for one of the victims on an answering machine.  In the recording, Zada advised the victim that his money could not yet be returned, assured him that the funds would be available soon, and said that his money had "doubled . . . in one year" "due to the fact that these funds were invested in multiple . . . investments and those investments need to be drawn out and terminated in order to pay you."

The second recording was made surreptitiously by victim Salvatore Martone III during a meeting at Zada's house about Martone's investment with Zada.  On the recording, Zada discussed, among other things, the investment "portfolio" and rates of return on the investment.  The recording contained gaps in the conversation apparently caused by starting and stopping of the recording device.  Martone testified at trial about his own investments with Zada and the

circumstances surrounding the making of the tape recording.  A transcript of the conversation was submitted to the jury.

Zada had moved *in limine* to exclude the recording and accompanying transcript after receiving *Jencks* material from the government after the trial began. The material included an FBI report of an interview with Martone, which indicated that Martone had admitted to manually turning off the recording during times in which he spoke.  Based on that admission, Zada argued that the tape should be excluded because it could not be authenticated, was far more prejudicial than probative, and violated the rule of completeness.

Outside of the jury's presence, the district court heard testimony from Martone about the making of the recording.  Contrary to what was suggested in the FBI report, Martone told the court that the gaps in the recording were not intentional, but instead were caused by him fumbling with the device, with which he was unfamiliar because he had purchased it the same day of the recording. Martone also told the court that there was very little of the conversation that was not captured on the tape.

The district court denied Zada's motion *in limine*.  In issuing its ruling, the court stated that it had listened to the complete recording three times, replayed various specific portions, reviewed the transcript of the recording, and considered Martone's testimony.  The court found that the interruptions in the recording were

6

not substantial and did not render the entire recording untrustworthy or unreliable. Noting Martone's testimony that he was not proficient in operating the recording device, the court found that he was proficient enough to obtain a reliable and trustworthy recording. Finally, the court determined that the probative value of the recording outweighed the prejudicial effect caused by the absence of portions of the conversation. Accordingly, the district court admitted the recording and accompanying transcript.

## C.    *Zada's Theory of the Defense*

Zada's theory of the defense was that he had merely borrowed money from numerous others in good faith in anticipation of receiving a large inheritance. The inheritance never materialized, however, leaving him unable to repay his debts. Unable to recoup the money they had lent him, the lenders fabricated the theory that their transactions with Zada were investments and not loans, either to mitigate the tax consequences of their loss or to punish Zada.

As part of that defense, Zada sought to present evidence regarding the efforts made by his lawyers to verify the legitimacy and value of the anticipated inheritance. In particular, Zada tried to introduce documents drafted by members of the (former) law firm of Hyman Lippitt, which represented Zada. These documents, all of which conveyed similar information, included three letters to bank employees, a letter to another law firm asking for tax advice, and an internal

7

memorandum of the law firm.  For example, Zada's attorney, Norman Lippitt, sent

the following letter to a bank officer in June 2004:

> I, along with my firm, represent Joseph P. Zada.  Joe has asked that I provide you certain confidential information with respect to his affairs.
>
> I have represented Joe for approximately five years, and I am very familiar with his business and personal life.
>
> Joe has asked me to provide you some information concerning a large inheritance he will receive from a deceased individual.  I have been working on this inheritance for over two years.  I have seen independent documentation to support the information Joe has provided.  I also have in my possession, a letter and financial statement from an internationally recognized accounting firm stating that the value of the assets to which Joe will be entitled as a result of the inheritance are far in excess of Two Hundred Fifty Million ($250,000,000.00) Dollars.  I am arbitrarily using that number just to be conservative.  The accounting firm has also confirmed that approximately sixty-five perfect (65%) of the assets are liquid.  We are currently engaged in discussions that will lead to Joe actually receiving the inheritance, which hopefully, will not be too far in the distant future.

Zada claimed that the documents were admissible as proof of his good-faith belief

in the inheritance because they showed that he had been advised by counsel that

the inheritance was real.

The district court excluded the proffered exhibits as inadmissible hearsay.

The court found that the documents were being offered for the truth of the matter

asserted, which made them hearsay, and that they did not meet any exception to the

8

rule against hearsay.[1]  The court rejected Zada's contention that the documents could be admitted for the nonhearsay purpose of showing the effect of his attorneys' advice to Zada about the existence of the inheritance.

Nevertheless, despite the exclusion of Zada's proffered exhibits, similar evidence came in during the government's case.  A similar letter to an investor is excerpted above.  In addition, during a bank CEO's testimony, the government introduced a letter one of Zada's lawyers sent to the bank in connection with a pending loan application.  That letter stated, in part,

> This firm represents Mr. Joseph P. Zada.  We have been asked to provide certain information with regard to our client.  I have represented Mr. Zada for over seven years in many business and personal transactions both domestic and international. . . . I understand that Mr. Zada has advised you of his expectancy that he is to receive a large bequest as an inheritance from a deceased individual. . . . I am authorized to confirm that I have been provided with documentation from an internationally recognized private accounting firm stating that the value of the assets to which Mr. Zada will be entitled as a result of that expected inheritance is in excess of $250 million[.]

## D.    *Jury Verdict*

Zada was tried on fifteen counts of mail fraud, in violation of 18 U.S.C. § 1341, and three counts of making false statements on a loan application, in violation of 18 U.S.C. § 1014.[2]  The jury returned a guilty verdict on all mail-fraud

---

[1]  More precisely, the district court concluded that the documents did not qualify as business records, under Rule 803(6), Fed. R. Evid., or as statements of Zada's then-existing state of mind, under Rule 803(3).  Zada does not challenge these rulings on appeal.

[2]  Other counts charged in the superseding indictment were dismissed by the district court before trial as barred by the statute of limitations.

counts and two of the three false-statement counts.  In finding Zada guilty of the two false-statement counts, the jury reported that it had not unanimously found that Zada knowingly made false statements that he expected an inheritance in excess of $250 million.  Thereafter, the district court granted Zada's motion for judgment of acquittal on the false-statements counts and adjudicated him guilty on the mail-fraud counts.

## E.    Sentencing Proceedings

In a revised presentence investigation report ("PSR"), a probation officer calculated a total offense level of 37 under U.S.S.G. § 2B1.1.  That offense level included sentencing enhancements for the extent of the loss (more than $20 million but less than $50 million), the number of victims (10 or more), the sophisticated means used in the offense, and Zada's role as an organizer or leader of criminal activity that was "otherwise extensive."  Zada had no criminal history, placing him in criminal history category I.  His total offense level of 37 and criminal history category of I established a guideline range of 210 to 262 months of imprisonment.

Zada objected to the enhancements for sophisticated means and his role in the offense.  Regarding his role in the offense, Zada argued that the four-level role enhancement did not apply because the criminal activity did not involve five or more participants and it was not "otherwise extensive" for purposes of U.S.S.G. § 3B1.1(a).

10

At sentencing, the district court considered additional evidence introduced by the government, including a deposition from John Whittles, one of Zada's attorneys, and heard argument from the parties on the objections. Ultimately, the district court sustained Zada's objection to the sophisticated-means enhancement but overruled his objection to the aggravating-role enhancement. Regarding the role enhancement, the court found that both Wolfgang and Zarrouk, Zada's purported connections to the secret board and the Saudi royal family, respectively, were participants in the fraud and that the criminal activity directed by Zada was "otherwise extensive." The court cited the length and scope of the criminal activity and Zada's use of numerous others as "unwitting" participants in the fraud.

Without the sophisticated-means enhancement, Zada's total offense level was 35, and his advisory guideline range was 168 to 210 months of imprisonment. The district court sentenced Zada to a total term of 210 months of imprisonment. This is Zada's appeal.

## II. Evidentiary Challenges

Zada first challenges two evidentiary rulings at trial. He argues that the district court abused its discretion both by admitting Martone's secretly made recording and by excluding his proffered exhibits regarding the alleged legitimacy of the inheritance.

We review the district court's rulings on admission of evidence for an abuse of discretion. *United States v. Rutgerson*, 822 F.3d 1223, 1239 (11th Cir. 2016). A district court's factual findings underlying an evidentiary ruling are reviewed for clear error. *United States v. Lebowitz*, 676 F.3d 1000, 1009 (11th Cir. 2012). We give substantial deference to the district court's credibility determinations. *United States v. Clay*, 483 F.3d 730, 744 (11th Cir. 2007).

We will reverse an erroneous evidentiary ruling only if the "error was not harmless." *United States v. Bradley*, 644 F.3d 1213, 1270 (11th Cir. 2011). An evidentiary error is harmless unless there is a reasonable likelihood that it affected the defendant's substantial rights. *Rutgerson*, 822 F.3d at 1239. Reversal is not warranted "where an error had no substantial influence on the outcome, and sufficient evidence uninfected by error supports the verdict." *Id.* (quotation marks omitted).

## A. *Trustworthiness of the Tape Recording*

To introduce a recording at trial, "the government must establish that it is an accurate reproduction of relevant sounds previously audited by a witness." *United States v. Reeves*, 742 F.3d 487, 501 (11th Cir. 2014) (internal quotation marks omitted). To that end, the government must prove "(1) the competency of the operator; (2) the fidelity of the recording equipment; (3) the absence of material deletions, additions, or alterations in the relevant portions of the recording; and (4)

the identification of the relevant speakers." *Id.* Those requirements need not all be satisfied, if there is independent evidence of the accuracy of the tape recording. *Id.* Because the district court has broad discretion whether to allow a recording to be played for the jury, the court's determination of authenticity will not be disturbed "unless there is no competent evidence in the record to support it." *Id.* (internal quotation marks omitted).

Here, the district court did not abuse its discretion in admitting the tape recording, notwithstanding the gaps in the recording. District courts may admit a recording with inaudible portions or gaps so long as the inaudible portions or gaps are not "so substantial as to render the recording as a whole untrustworthy." *United States v. Lively*, 803 F.2d 1124, 1129 (11th Cir. 1986) (quotation marks omitted). Sufficient competent evidence supports the district court's finding that that the gaps in the recording were not substantial or material and that the recording as a whole was reliable and trustworthy.[3]

The district court based its determination on Martone's in-court testimony and the court's thorough review of the recording and the accompanying transcript. Martone testified that the recording accurately captured a substantial portion of his conversation with Zada, that only a "very small amount" of the conversation was

---

[3] Zada does not challenge the district court's findings as to the competency of the operator, the fidelity of the recording equipment, or the identification of the relevant speakers. *See Reeves*, 742 F.3d at 501.

not on the tape, that the gaps in the recording were brief, and that he did not ask questions during the breaks. Nor did Martone delete, add, or alter anything on the recording after it was made. In addition, the transcript of the recording generally shows complete sentences capable of comprehension without further context. For instance, as the district court noted, one section of the tape was essentially an uninterrupted monologue of Zada speaking for over four minutes, which constituted about half of the total recording. Thus, the record shows that the district court had a sufficient evidentiary basis to conclude that the recording was reliable and trustworthy.

Zada contends that the district court's analysis is fundamentally flawed because the court failed to address or appreciate the fact that Martone deliberately manipulated the recording by selectively recording only parts of the conversation. A deliberately manipulated recording, according to Zada, cannot meet the standard of trustworthiness. Zada claims that the case should, at the very least, be remanded to the court to resolve the factual conflict of whether the gaps in the recording were deliberately created by Martone, as suggested by the FBI report, or whether the gaps were inadvertently made due to his fumbling with the recording device, as Martone testified in court.

Although the district court did not make an explicit finding as to this factual issue, remand is unnecessary under the circumstances. In concluding that the

14

recording was reliable and trustworthy, the court appears to have credited Martone's in-court testimony about his operation of the recorder over the conflicting statement in the FBI report. We infer that implied credibility determination, though unstated, because it is consistent with the court's crediting of other aspects of Martone's testimony and with its ultimate ruling on the admissibility of the recording. *See United States v. $242,484.00*, 389 F.3d 1149, 1154 (11th Cir. 2004) ("[W]e and other federal appellate courts have inferred from a district court's explicit factual findings and conclusion implied factual findings that are consistent with its judgment although unstated."). And because the district court was in a better position to assess Martone's credibility, we defer to its credibility determination. *See Clay*, 483 F.3d at 744.

For these reasons, the district court's determination that the omitted portions of the recording were not material or substantial was a reasonable determination supported by competent evidence in the record. *See Reeves*, 742 F.3d at 501–02; *Lively*, 803 F.2d at 1129. In light of that conclusion, the court did not abuse its discretion in concluding that the probative value of the recording outweighed the prejudicial effect of any omitted portions. *See* Fed. R. Evid. 403.

Even if the district court erred in admitting the recording, however, the error was harmless because other evidence in the record, including other statements from Zada, overwhelmingly showed that the transactions were investments.

Numerous victims testified and told consistent stories about how their transactions were investments, and the jury heard another recording involving a different victim where Zada explicitly referred to the victim's funds as having been "invested." In light of the substantial evidence of guilt uninfected by any error, Zada cannot show that the outcome of the trial would have been different had the recording been excluded. *See Rutgerson*, 822 F.3d at 1239.

## B.    *Zada's Exhibits Regarding the Alleged Inheritance*

Zada next challenges the district court's finding that exhibits written by his attorneys regarding the alleged inheritance were inadmissible hearsay. Hearsay is generally not admissible. Fed. R. Evid. 802. Hearsay is an out-of-court statement offered "in evidence to prove the truth of the matter asserted." *United States v. Rivera*, 780 F.3d 1084, 1092 (11th Cir. 2015). An out-of-court statement is not hearsay if it is offered to show its effect on the person who heard or read the statement. *Id.* Such a statement is relevant because it was made, not because it is truthful.

Zada contends that he offered the proposed exhibits for the nonhearsay purpose of showing his good-faith belief that he would receive a substantial inheritance, not for the truth of the matters asserted in any of the documents. He asserts that the exhibits were circumstantial evidence that he was privy to information which suggested that the inheritance was real. He claims that the case

16

of *United States v. Cancelliere*, 69 F.3d 1116 (11th Cir. 1995), is a "mirror image of the case at bar."

In *Cancelliere*, the district court admitted in evidence letters the defendant received from his father because they were relevant to the defendant's "state of mind, knowledge, beliefs or intent as a consequence of reading them." 69 F.3d at 1122. The court found that the letters, which informed the defendant that his trust fund was depleted and that his father would not help him financially, were probative of whether the defendant knowingly made contrary, false statements to banks. *See id.* at 1122–23. On appeal, the defendant argued that the letters were inadmissible hearsay because the statements in the letters were relevant only if they were true. We upheld the admission of the letters not for the truth of the matters asserted in the letters, but rather for their effect on the defendant's state of mind—that is, to show that he "knew when he made the statements to the banks, that the statements were false." *Id.* at 1123.

Here, the district court did not abuse its discretion because the exhibits were inadmissible hearsay. Unlike in *Cancelliere*, the documents in this case were not admissible for their effect on Zada because there is nothing in the record to suggest that he ever saw them. What Zada's attorneys told others has no bearing on Zada's state of mind. And, as the district court noted, much of the information in the documents came from Zada himself. Zada's contention that the documents are

17

admissible to show the information and advice he received from his attorneys is dubious. The documents themselves do not suggest what his attorneys told him, and even if they did, that would not get around the hearsay problem. The statements in the documents still appear to be offered for the truth of the matters asserted therein—for instance, that the attorney had seen independent corroborating documentation of the inheritance.

But even if the exhibits were admissible for Zada's purported nonhearsay purpose, any error was harmless. Similar exhibits were introduced as part of the government's case-in-chief, so Zada was able to argue his good-faith theory to the jury. Indeed, the record suggests that the jury accepted his argument about the inheritance, since it found that he did not knowingly make false statements about the inheritance in connection with the false-statements counts. Nevertheless, the jury still concluded that he was guilty of mail fraud based on his misrepresentations to the victims regarding their investments, about which there was ample evidence in the record. Viewed in the context of the entire trial, Zada has not shown that the exclusion of the documents was anything other than harmless. *See Rutgerson*, 822 F.3d at 1239.

### III. Sentencing

Finally, Zada contends that the district court erred in imposing a sentencing enhancement for his role as an organizer or leader of "otherwise extensive"

18

criminal activity. *See* U.S.S.G. § 3B1.1(a). We review the district court's factual finding of a defendant's role in an offense for clear error. *United States v. Moran*, 778 F.3d 942, 979 (11th Cir. 2015). "For a factual finding to be clearly erroneous, we must be left with a definite and firm conviction that a mistake has been committed." *Id.* The sentencing court's factual findings may be based on evidence heard during trial, undisputed facts in the presentence investigation report, or evidence presented during the sentencing hearing. *United States v. Polar*, 369 F.3d 1248, 1255 (11th Cir. 2004).

Role adjustments under § 3B1.1 are designed primarily to address "concerns about relative responsibility." U.S.S.G. § 3B1.1 cmt. background. The adjustments are based on two main factors: "the size of a criminal organization (i.e. the number of participants in the offense) and the degree to which the defendant was responsible for committing the offense." *Id.* The largest adjustment, a four-level increase to the offense level, is for a defendant who "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." *Id.* § 3B1.1(a). A "participant" is someone "who is criminally responsible for the commission of the offense, but need not have been convicted." *Id.* § 3B1.1 cmt. n.1.

The district court found that § 3B1.1(a) applied because the criminal activity Zada organized was "otherwise extensive." According to the commentary to this

19

provision, sentencing courts should consider "all persons involved during the course of the entire offense," including outsiders who unknowingly provided services. *Id.* § 3B1.1 cmt. n.3. So, for example, "a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive." *Id.* "[N]o set number of criminally responsible participants is required" for criminal activity to be sufficiently extensive, except that there must be at least one "participant" other than the defendant. *United States v. Holland*, 22 F.3d 1040, 1045 & n.8 (11th Cir. 1994).

This circuit does not "employ a precise definition for the 'otherwise extensive' standard." *Holland*, 22 F.3d at 1045. We have, however, identified factors relevant to the extensiveness determination, including "the length and scope of the criminal activity as well as the number of persons involved." *Id.*; *cf. United States v. Sosa*, 777 F.3d 1279, 1301–02 (11th Cir. 2015) (holding that a Medicaid fraud scheme was otherwise extensive where, among other things, the defendant recruited patients, falsified medical records, and received almost $119,000"); *United States v. Rodriguez*, 981 F.2d 1199, 1200 & n.3 (11th Cir. 1993) (concluding that criminal activity was "otherwise extensive" based on its extensive geographic reach and the amount of cocaine involved).

Here, the record amply supports the district court's finding that the criminal activity was "otherwise extensive" for purposes of applying the four-level

20

enhancement under § 3B1.1(a).  The length and scope of the criminal activity plainly were extensive.  *See Holland*, 22 F.3d at 1046.  Zada organized and operated a fraud that lasted for over ten years and resulted in the loss of over $20 million.  He was intimately involved in all aspects of the criminal activity and was its primary, if not sole, beneficiary.  The fraud included at least one other participant, Wolfgang, as Zada concedes.  *See id.* at 1045 n.8.  And Zada used the unknowing services of numerous others to perpetrate the fraud.  *See* U.S.S.G. § 3B1.1 cmt. n.3.  We are convinced that this criminal activity meets the "otherwise extensive" standard that this Circuit has applied.

In response, Zada argues that this reasoning sweeps too broadly.  Relying on the approach of the Second and Sixth Circuits, among others, Zada contends that the primary focus in the extensiveness inquiry should be on "numerosity"—that is, the size of the criminal organization.  According to the Sixth Circuit, for example, the principal inquiry for determining extensiveness under § 3B1.1(a) is whether "the offense in question was somehow the functional equivalent of a crime involving five or more participants."  *See United States v. Anthony*, 280 F.3d 694, 699 (6th Cir. 2002); *see also United States v. Carrozzella*, 105 F.3d 796, 802–03 (2d Cir. 1997).  The inquiry primarily is one of head counting, focusing on the persons involved and requiring consideration of "how significant the role and performance of an unwitting participant was to the ultimate criminal objective."

21

*Anthony*, 280 F.3d at 701. Zada contends that any other approach runs the risk of impermissibly double counting factors, such as the loss amount, the number of victims, and the complexity of the means used, which are accounted for by other guideline provisions.

Other circuits, however, use a broader approach. The First Circuit, for example, determines extensiveness based on the totality of the circumstances, "including not only the number of participants but also the width, breadth, scope, complexity, and duration of the scheme." *United States v. Colon-Munoz*, 318 F.3d 348, 364–65 (1st Cir. 2003). While we have not expressly addressed the circuit split, *Holland* suggests that this circuit uses a broader, totality-of-the-circumstances-based approach. *See Holland*, 22 F.3d at 1046 (stating that extensiveness depends on "the length and scope of the criminal activity as well as the number of persons involved").

In any case, even using Zada's preferred inquiry, the criminal activity in this case was the "functional equivalent of a crime involving five or more participants." *See Anthony*, 280 F.3d at 699. To begin with, there were at least two knowing participants, Zada and Wolfgang. *See Holland*, 22 F.3d at 1045 ("when determining the number of participants, the defendant is considered to be one of the five"). And at least four other unwitting participants provided services that were essential to the fraudulent scheme, at Zada's direction. Zada told some

investors that Zarrouk[4] was his liaison to the Saudi royal family and used him to convince investors that Zada's connections to Saudi oil were legitimate. Zada also used and directed at least three attorneys to communicate with investors for the purposes of deceiving them about their investments and when they would receive their money. The attorneys gave an appearance of legitimacy to the fraud and delayed the eventual reporting of the investors' claims to the authorities. Even some of the victims, such as hockey great Sergei Federov, could be considered the functional equivalent of participants, since Zada used them to extend the reach of the criminal activity by recruiting and managing other investors.[5] In sum, the criminal activity Zada organized and led qualifies as "otherwise extensive" even under a stricter numerosity-based approach. Accordingly, the district court did not err in applying the four-level enhancement under U.S.S.G. § 3B1.1(a).

For all of these reasons, we affirm Zada's convictions and sentence.

**AFFIRMED.**

---

[4] Zada contests the district court's finding that Zarrouk was a knowing participant, but we need not resolve the matter because, even if he lacked criminal intent, he qualifies as the functional equivalent of a participant.

[5] Zada suggests that counting the victims themselves as the functional equivalent of participants "seems to raise at least the specter of double-counting," given that these victims are also accounted for in the enhancement for number of victims. We disagree. It is one thing to defraud a person of money, and thereby make that person a victim, but quite another to use that person's unwitting services to help defraud someone else.

23