[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-13818

_____

D.C. Docket No. 1:16-cr-20050-DPG-5

UNITED STATES OF AMERICA,                              Plaintiff - Appellee,

versus

WILLIAM MUNOZ,
a.k.a. Guillermo,
JETHRO PITTS,
a.k.a. Uncle Jeth,                                      Defendants - Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(May 28, 2020)

Before JORDAN and NEWSOM, Circuit Judges, and WRIGHT,* District Judge.

WRIGHT, District Judge:

_____

* Honorable Susan Webber Wright, United States District Judge for the Eastern District of Arkansas, sitting by designation.

Following a joint trial, Appellants William Munoz, also known as "Guillermo," and Jethro Pitts, also known as "Uncle Jeth," were convicted and sentenced for participation in separate conspiracies to possess and distribute heroin. In this consolidated appeal, they challenge their convictions and sentences. After careful review and oral argument, we affirm.

## I.  BACKGROUND

### A.    Procedural History

On January 26, 2016, a grand jury returned a twelve-count indictment against Munoz and Pitts and eighteen codefendants. The charging document included three drug conspiracy counts and nine substantive counts arising from the conspiracies. Relevant to this appeal are Counts One and Three, charging separate conspiracies to possess with intent to distribute heroin in Miami-Dade County and elsewhere, in violation of 21 U.S.C. §§ 841(a)(1) and 846. Count One charged Munoz and seven codefendants for conduct involving one kilogram or more of heroin, occurring from in or about April 2014 through on or about December 17, 2015, and Count Three charged Pitts and ten codefendants for conduct involving 100 or more grams of heroin, occurring in or about January 2015 through on or about December 17, 2015. Munoz was also charged under Count Twelve for possession with intent to distribute one kilogram or more of heroin on December 3, 2015.

2

From May 8 through 19, 2017, the United States tried Munoz and Pitts jointly, apart from their codefendants. At the close of all evidence, the district court denied the defendants' renewed motions for judgment of acquittal, and a jury found them guilty as charged. On August 11, 2017, the district court sentenced Munoz to 188 months' imprisonment and five years' supervised release, and on November 30, 2017, the district court sentenced Pitts to 78 months' imprisonment and 4 years' supervised release.

## B.    Government's Evidence

The government's evidence included testimony by Jason Stankiewicz, a special agent with the Bureau of Alcohol, Tobacco, and Firearms (ATF), and codefendant Sean William Watkins, who had pleaded guilty to each of three conspiracy counts charged in the indictment. Stankiewicz detailed a years-long undercover investigation that lead to the conspiracy charges in this case, and Watkins provided testimony about his contacts and dealings with Munoz, Pitts, and other codefendants.

### a.    Codefendants Watkins and Diaz-Fernandez Plan a Heroin Supply and Distribution Chain

In 2013, the ATF began a long-term investigation of heroin trafficking in Miami, Florida that utilized state task force officers, confidential informants, pen registers, wiretaps, and physical surveillance. The investigation began with controlled buys from a Miami street dealer, codefendant Morris Moore. In May

3

2015, agents monitored Moore's calls and identified codefendant Sean Watkins as the source of his heroin supply.

In April 2014, Watkins met codefendant Joel Diaz-Fernandez while the two were serving time in a North Carolina jail, and they agreed to join forces to distribute cocaine. After both men were free, Diaz-Fernandez called Watkins, who lived in Miami, and they made plans for Watkins to visit to Diaz-Fernandez's home in Mexico.

Watkins obtained a passport and flew to Mexico in early 2015. Codefendant Francisco Quezada Del Pilar, also known as "Frank," met Watkins at the airport, and the two men traveled by bus to Diaz-Fernandez's home, where Watkins met with Diaz-Fernandez, Frank, and Diaz-Fernandez's boss, who Watkins knew only as "No Pictures." Rather than distribute cocaine, it was agreed that No Pictures would sell Watkins heroin for $70,000 per kilogram on a "fronted" basis. "Fronting amounts to a credit sale where the debt is repaid through street sale profits." *United States v. Burroughs*, 830 F.2d 1574, 1580 (11th Cir. 1987). According to the plan, No Pictures would send the heroin to a distribution hub in Atlanta, where Watkins would collect the drugs and pay later, after he sold his supply.

Watkins returned home to Miami and began lining up customers for anticipated heroin, communicating with Diaz-Fernandez by phone and text on a

regular basis.  Not able to speak English, Diaz-Fernandez communicated  through

an interpreter—a family member, who Watkins knew only as "Nephew."  Multiple

times after Watkins's visit to Mexico, Diaz-Fernandez and Nephew notified him

by phone that heroin was available for pick up.  Approximately every ten days,

Watkins traveled to Atlanta with his friend, co-defendant Shelton Edden, and they

received heroin at an apartment belonging to  codefendant Crecencio Silverio, also

known as "Chencho."  After receiving the heroin, Watkins would place it in a

duffel bag and ship it by bus to Miami, where he would break the product into

ounce portions and store it at his mother's apartment.

### b.    Appellant Jethro Pitts Distributes Heroin in Miami

Watkins's heroin customers placed orders by phone, using code words.  One

such customer was Appellant Pitts, a street dealer related to Watkins by marriage,

whom Watkins called "Uncle Jeth."  Watkins normally sold heroin by the ounce,

but he had a special arrangement with Pitts and fronted him individual packs that

contained 100, heroin-filled capsules.  Watkins prepared each pack by hand,

grinding heroin and filling capsules, a process that consumed at least thirty

minutes.  Each pack of 100 capsules contained a total three to four grams of heroin,

and each capsule had a street value of $10, making each pack worth $1000.

Beginning in spring 2015, Pitts obtained two packs from Watkins every day, and

he gave Watkins $700 of the proceeds, keeping $300 for himself.  Pitts and

Watkins normally transacted business at Watkins's mother's apartment, and Pitts sometimes drove to the location using his son's car. Pitts also used his son's car to drive to Edden's house, where Watkins, Pitts and others would "hang out." Pitts's son, Jeffrey, never purchased heroin from Watkins, nor did he visit Watkins's mother's apartment.

On July 24, 2015, Pitts called Watkins, and using code words, he requested an ounce of heroin for $2,000, rather than his usual capsule packs. Watkins told Pitts that as they were speaking, he was texting back and forth with his supplier and would have more heroin soon, but at that time, he could only give him packs.

At the end of July 2015, Watkins vacationed in Amsterdam for six days with his girlfriend. While Watkins was absent from Miami, he continued to supply Pitts with heroin. Watkins instructed Edden to keep 10 to 12 packs on hand for Pitts, who was selling capsules at a rapid pace. Watkins returned to Miami in early August, and Pitts spoke with Watkins on the phone on August 4, 5, 6, 8, and 15, 2015 to place orders for and organize heroin deals. During that time frame, Watkins began giving Pitts five packs at a time, which lasted two to three days before Pitts needed a new supply.

On August 8, 2015, Watkins and Pitts discussed the need to increase the pace of sales. Watkins advised Pitts that he couldn't have "tickets," meaning packs of capsules, just "sitting around." In response, Pitts referred to an unidentified

6

dealer who peddled his capsules, and he told Watkins that he had been urging the dealer to "push it up." Watkins and Pitts agreed that Pitts's unidentified dealer could "do four to five a day, easy."

### c.    Watkins Begins Cooperation

On August 20 and 24, 2015, monitored communications between Watkins and Diaz-Fernandez revealed that Watkins would obtain more heroin in Atlanta. On August 25, 2015, with agents watching his every move, Watkins headed to Atlanta with a woman named Raquel Tammy Sands and Edden. After the trio arrived in Atlanta and checked into a hotel, Watkins and Edden departed for Decatur, where they met codefendant Tiffany Ebony Knights. The next day, after a heads-up call from Nephew, Watkins went to Chencho's apartment and picked up 2.167 kilograms of heroin, which he stashed at Knight's residence in Decatur.

With the transaction complete, Watkins and Edden headed back to Miami, driving through the night, but before they made it home, officers pulled them over and told them about the years-long heroin trafficking investigation. The next day, August 28, 2015, Watkins agreed to cooperate with law enforcement, and agents recovered the 2.167 kilograms of heroin that Watkins had stored in Decatur.

Watkins's debt for the heroin that agents had recovered remained outstanding, and Diaz-Fernandez, unaware of Watkins's cooperation, instructed him to deliver $120,000 to Chencho's apartment, where additional heroin would be

7

waiting.  The transaction was planned for September 11, 2015, but Watkins did not deliver the money as expected.  Instead, officers showed up and searched Chencho's apartment, where they recovered 2.968 kilograms of heroin and arrested Chencho and codefendant Margarita Barragan-Velez.  Pursuant to law enforcement's direction, Watkins provided Diaz-Fernandez the explanation that he had attempted to deliver the $120,000, but officers stopped him on the way to Chencho's and seized the money.

### d.    Appellant Munoz's Activities

After the September 11, 2015 drug seizure and arrests at Chencho's apartment, Nephew alerted Watkins that Diaz-Fernandez wanted him to return to Mexico.  In a recorded phone call that took place on October 8, 2015,  Nephew suggested that Watkins enter the country using a method repeatedly utilized by Munoz.  Nephew told Watkins that for the six months prior, Munoz, whom Nephew referred to as Guillermo, had entered Mexico from the United States without a passport to deliver money to Diaz-Fernandez.  As Nephew explained it, Guillermo crossed between Mexico and the United States undetected, with the assistance of Diaz-Fernandez's "guy" at the border.  Ultimately, however, it was agreed that it would be too risky for Watkins to travel to Mexico a third time.

With Chencho and the Atlanta distribution hub gone, Diaz-Fernandez planned operations in Miami, where he would station codefendant Marco Antonio

8

Zagal-Garcia, also known as "Tono."  Diaz-Fernandez directed Watkins find a house for Tono in Miami, and Munoz wired money to Watkins for a that purpose. After Watkins received the money, Diaz-Fernandez sent Munoz a text message stating:  "Thank you, Guillermo."

Tono arrived in Florida from Mexico on November 7, 2015, and Diaz-Fernandez arranged for Watkins and Tono to obtain a supply of heroin in West Palm Beach.  On November 11, 2015, Watkins, Tono, and a confidential informant ("CI") drove to a Walmart parking lot in West Palm Beach.  There, Tono acquired two kilograms of heroin from two men in a black truck: codefendants Israel Garcia-Gasper and Jehu Aguilar-Hernandez.  After the transaction, Watkins dropped Tono at his hotel and debriefed law enforcement, who recovered the heroin from the trunk of Watkins's car.

On December 3, 2015, a second undercover operation took place at the same Walmart parking, but it did not proceed as planned.  From the perspective of Diaz-Fernandez, Watkins would receive two additional kilograms of heroin that day and pay $120,000 for the two kilograms that he had received on November 11.  Law enforcement planned to use counterfeit money, envisioning that the fake cash and heroin would exchange hands simultaneously, at which point, agents would conduct a "take down."  An undercover agent played the role of a money courier,

9

who would follow Watkins to the transaction site in a separate vehicle that carried the phony money.

In conversations leading up to the transaction, Diaz-Fernandez told Watkins that Munoz would accompany him and that Tono had returned to Mexico. Watkins knew Munoz from a meeting in spring 2015, when Watkins visited Diaz-Fernandez's home in Mexico a second time, with the aim of obtaining a lower price for his heroin supply. During that visit, before No Pictures arrived for negotiations, Watkins, Diaz-Fernandez, and Munoz "hung out," and Munoz told Watkins that he lived in Chicago and could acquire cocaine and marijuana. Once No Pictures arrived, it was agreed that Watkins's price would be lowered to $60,000 per kilogram, and Munoz was present during the negotiations.

According to plan, on December 3, 2015, Watkins and a CI collected Munoz at his hotel, with a car that law enforcement had equipped with a hidden camera and an audio surveillance transmitter. Watkins and Munoz immediately recognized each other from their spring 2015 introduction in Mexico, and during the drive to West Palm Beach, they discussed the events of September 11, 2015, when officers ostensibly confiscated $120,000 from Watkins. Munoz, unaware that the purported confiscation was ruse designed to cover Watkins's cooperation, revealed, among other things, that he knew Chencho and that Diaz-Fernandez told him all about the September 11 traffic stop. Munoz also discussed details of the

10

drug trafficking business, and he commented that Diaz-Fernandez was "stuck" on dealing heroin, exclusively.

The undercover operation fell apart soon after Watkins drove into the Walmart parking lot. Munoz took charge and instructed Watkins to park among other vehicles, not out in the open, and he directed Watkins to give him $26,000 of the $120,000. Munoz further dictated that the money would change hands first, after which he would retrieve the heroin from an offsite location. Given law enforcement's plan to use counterfeit money, Munoz's instructions presented a problem.

As Watkins and Munoz quarreled about how the transaction would proceed, the same black truck that had delivered heroin to Watkins and Tono a month earlier pulled into the lot. With no other option, agents initiated a take down. Munoz told Watkins to leave the scene, but agents quickly swept in and detained the occupants of Watkins's vehicle and the occupants of the black truck, one of whom was codefendant Garcia-Gasper. Agents seized two cell phones from Munoz and one from Garcia-Gasper, and they pretended to confiscate $120,000 in currency. No drugs were recovered, and the detainees were released. A subsequent forensic examination revealed that the phone recovered from Munoz had been used for 437 contacts with Diaz-Fernandez.

11

Watkins continued his cooperation, and on December 16, 2015, he received a text message from Nephew, conveying that Diaz-Fernandez knew what he had been doing and no longer trusted him.  Nephew's message concluded:  "We'll be up there in January to chop it up with you. . . . See you soon."  At the direction of law enforcement, Watkins called Diaz-Fernandez the next day, and speaking to Nephew, he attempted to convince Diaz-Fernandez that he was not working with law enforcement.  During the call, Nephew told Watkins that Munoz had conveyed the "whole story" about the events of December 3, 2015 to Diaz-Fernandez, and Nephew repeated details confirming that Munoz had indeed reported to Diaz-Fernandez.

The information that Munoz provided Diaz-Fernandez convinced Diaz-Fernandez that Watkins could be trusted.  To maintain that trust until arrests could proceed, law enforcement arranged for Watkins to send money to Diaz-Fernandez.  On January 26, 2016, a grand jury returned the indictment in this case, and on January 28, 2016, law enforcement arrested Watkins, Munoz, Pitts, and other codefendants.

## C.    Defendants' Evidence

Pitts presented no case in chief, but Munoz elected to take the stand in his own defense.  Munoz testified that he and Diaz-Fernandez had been close friends since 1992 and that they spoke to each other "most likely" every day.  Despite his

12

close relationship with Diaz-Fernandez, Munoz claimed that he did not know that his bosom buddy had served time for narcotics trafficking during their decades-long friendship.

Munoz asked jurors to believe that he happened to be vacationing in Florida in December 2015 and was an unwitting bystander during the attempted drug transaction that occurred on December 3, 2015.  According to Munoz's testimony, he was present at the scene only because Diaz-Fernandez had requested that he accompany Watkins to collect $120,000 from the sale of a house.  Munoz testified that Diaz-Fernandez had facilitated the real estate transaction for a friend and that he instructed Munoz to take $26,000 of the purchase money as a finder's fee and deliver the remainder to the home seller's relative.  Munoz also claimed that when Watkins began talking about drug trafficking, he played along because he was afraid that Watkins would throw him into a swamp, and he would never be found.

On direct examination, Munoz claimed that he met Watkins for the first time when Watkins picked him up at his hotel on December 3, 2015.  On cross-examination, when confronted with the recorded statements he made in Watkins's car on December 3, 2015, Munoz admitted that he had spoken to Watkins a few times before December 3, 2015.

13

## II.  ISSUES ON APPEAL

In this consolidated appeal, Pitts argues that (1) there was insufficient evidence to sustain his conviction and (2) the district court erred in failing to grant him a minor-role reduction.  Munoz argues that (1) the evidence at trial varied from the indictment and demonstrated multiple conspiracies, which entitles him to a new trial, (2) the district court erred in attributing to him a greater drug amount than warranted by the evidence, and (3) the district court erred in failing to grant him a minor-role reduction.

## III.  DISCUSSION

### A.    Pitts: Sufficiency of Evidence

Count Three charged that from January 2015 through December 17, 2015, in Miami and elsewhere, Pitts, Watkins, Edden and eight codefendants conspired to possess with intent to distribute heroin.  Count Three attributed varying amounts of heroin to each defendant, with 100 grams or more attributed to Pitts and one kilogram or more attributed to Watkins and Edden.  Pitts contends that the government failed to show that he had knowledge of the purpose of the conspiracy. He also challenges the jury's individualized drug-quantity finding, which attributed 100 grams or more of heroin to him.

We review *de novo* whether the evidence supports a conviction.  *United States v. Reeves*, 742 F.3d 487, 497 (11th Cir. 2014) (citing *United States v.*

14

*Capers,* 708 F.3d 1286, 1296 (11th Cir.2013)).  We review the evidence in a light most favorable to the jury verdict, drawing all inferences in its favor, and "we are obliged to affirm the convictions if a reasonable jury could have found the defendant guilty beyond a reasonable doubt." *Id.*

"To sustain a conviction for conspiracy to distribute narcotics, the government" shoulders the burden to prove beyond a reasonable doubt that (1) "an agreement existed between two or more people to distribute the drugs;" (2) "the defendant . . . knew of the conspiratorial goal;" and (3) the defendant "knowingly joined or participated in the illegal venture." *United States v. Brown*, 587 F.3d 1082, 1089 (11th Cir. 2009) (internal quotation marks and citation omitted).  Once the existence of a conspiracy is established, a defendant's guilt can be proved even if his participation is limited by comparison to the actions of other co-conspirators. *United States v. Toler*, 144 F.3d 1423, 1427-28 (11th Cir. 1998).  A defendant's guilt can be established even where his contact extends to only one or two of the co-conspirators, provided that "the agreement, with its concomitant knowledge of the general scope and purpose of the conspiracy and the defendant's intent to participate in achieving its illegal ends, is proven beyond a reasonable doubt." *Id*. at 1428.

With evidence of repeated heroin transactions between Watkins and Pitts, a jury could reasonably infer an agreement to distribute heroin. *United States v.*

15

*Thompson*, 422 F.3d 1285, 1292 (11th Cir. 2005) (quoting *United States v. Johnson,* 889 F.2d 1032, 1035–36 (11th Cir.1989)) (noting that "an agreement to distribute drugs 'may be inferred when the evidence shows a continuing relationship that results in the repeated transfer of illegal drugs to [a] purchaser'"). The trial evidence demonstrated that Watkins supplied Pitts an average of two packs of heroin capsules every day, from spring 2015 through mid-August 2015, and Pitts brought Watkins the proceeds of his sales and kept thirty percent for himself.

The evidence also supported findings beyond a reasonable doubt that Pitts knew about the essential nature of the conspiracy and that he took an active role in achieving its illegal ends. Jurors heard a recorded phone conversation in which Watkins and Pitts discussed the need to increase the pace of sales and avoid having tickets sitting around. During that conversation, Pitts reported his efforts, telling Watkins that he had pressured a subordinate to "push . . . up" sales. In another conversation, Pitts demonstrated his willingness to deal larger quantities of heroin by requesting an ounce, rather than his usual pack of capsules.

Jurors also learned that Watkins and Pitts spoke in code language when planning their illegal transactions over the phone and that Pitts drove his son's car to conduct business with Watkins. With this evidence, indicating that Pitts took steps to conceal the conspiracy, a jury could reasonably infer that he knew of and

16

participated in the illegal scheme. *United States v. Reeves*, 742 F.3d 487, 500 (11th Cir. 2014) ("Indeed, efforts to conceal a conspiracy may support the inference that a defendant knew of the conspiracy and joined it while it was in operation.").

Finally, we have no difficulty sustaining the jury's finding that Pitts conspired to possess with intent to distribute 100 grams of more of heroin. Pitts contends that the government, at best, proved that he carried out several deliveries for Watkins that involved miniscule amounts of heroin, which "certainly" totaled less than 100 grams. But viewing the evidence in a light most favorable to the verdict, the government proved that Pitts distributed heroin from spring 2015 through mid-August, 2015 and that he received two, 100-capsule packs from Watkins every day, except for a period when he received five packs every two to three days. The evidence also showed that each pack contained three to four grams of heroin. Even if Pitts began his distribution activities toward the end of spring, the evidence showed that his activities involved considerably more than 100 grams of heroin.

## B.    Pitts:  Denial of Minor-Role Reduction

Pitts next appeals the district court's decision to deny his motion for a minor-role sentence reduction under U.S.S.G § 3B1.2(b). The determination of a defendant's role in an offense is a finding of fact reviewed for clear error. *United*

17

*States v. Rodriguez De Varon,* 175 F.3d 930, 937 (11th Cir.1999) (en banc).  A minor-role reduction under U.S.S.G. § 3B1.2(b) "applies to a defendant . . . who is less culpable than most other participants in the criminal activity, but whose role could not be described as minimal."  U.S.S.G. § 3B1.2, comt. n.5.  "[T]he proponent of the downward adjustment bears the burden at all times of establishing [his] role in the offense by a preponderance of the evidence."  *De Varon*, 175 F.3d at 934.  In determining whether to grant a minor-role reduction, a sentencing court considers two principles:  "first, the defendant's role in the relevant conduct for which [he] has been held accountable at sentencing, and, second, [his] role as compared to that of other participants in [his] relevant conduct."  *Id.* at 940.

A United States probation officer prepared Pitts's presentence investigation report ("PSI"), holding him accountable for 100 grams of heroin, which resulted in a recommended base offense level of 24, and without any adjustments, a recommended total offense level of 24.  With a criminal history category of IV, Pitts's advisory guideline range was 77 to 96 months' imprisonment.

Pitts objected to several facts set forth in the PSI, none of which affected the computation of the advisory guideline range.  He also asserted that he was entitled to a two-level, minor-role reduction under USSG 3B1.2(b), arguing that he was merely a "courier/delivery man for Watkins."

18

After resolving Pitts's objections to inconsequential factual statements, the district court denied a two-point reduction, noting that Pitts had been held responsible only for the heroin that he had personally handled and sold, not the total amount involved in the conspiracy under Count Three.  The district court stated:  "So, having considered all the *De Varon* factors, I cannot find a sufficient basis in this record to grant a role reduction."  Considering the PSI, the parties' statements and arguments, and the sentencing factors under 18 U.S.C. § 3553(a), the district court sentenced Pitts to 78 months' imprisonment.  In concluding the sentencing hearing, the district court noted that if Pitts had received a two-point reduction, his advisory range would be 63 to 78 months, and his sentence would still fall within the guideline range.

We find no clear error.  The relevant conduct attributed to Pitts in calculating his base offense level was limited to possession with intent to distribute at least 100 grams of heroin, and Pitts failed to carry his burden to prove that he was a minor participant in that relevant conduct.  The district court noted that if Pitts had been held accountable for the larger amount of heroin involved in the conspiracy, the result might be different, but such was not the case.  Furthermore, the district court indicated that if it had granted a minor-role reduction, it would still impose the same sentence based on its consideration of factors under

19

§ 3553(a), and Pitts does not argue that his sentence was substantively

unreasonable.

### C.    Munoz:  Single or Multiple Conspiracies

"A material variance between an indictment and the government's proof at

trial occurs if the government proves multiple conspiracies under an indictment

alleging only a single conspiracy." *United States v. Castro*, 89 F.3d 1443, 1450

(11th Cir. 1996) (citing *Kotteakos v. United States,* 328 U.S. 750 (1946)).

Disregarding the actual content of the charging document in this case, Munoz

argues that "the indictment identified [twenty] individuals in a single conspiracy to

possess and distribute heroin from January through December 2015, [but] the proof

at trial established two separate conspiracies, resulting in [a] fatal variance."

Munoz proposes that the first conspiracy, which he calls the "Watkins-Pitts

conspiracy," involved street-level heroin trafficking in Miami by Watkins, Edden,

and Pitts.  As Munoz explains it, the "Watkins-Pitts" conspiracy began in July

2015 and ended in August 2015, when Watkins agreed to cooperate with law

enforcement.  Watkins says that a second conspiracy, which he calls the "Diaz-

Fernandez conspiracy," lasted from spring 2015 through December 17, 2015 and

involved Diaz-Fernandez distributing two-kilogram quantities of heroin to

Watkins.  Munoz contends that his conduct was limited to the "Diaz-Fernandez

conspiracy," and his participation began and ended on December 3, 2015, the day that agents detained him in the Walmart parking lot and seized his phones.

Munoz's fatal-variance claim (that the indictment charged a single conspiracy, but the evidence established two) defies the stark reality that the indictment in this case charged three separate conspiracies. Even if we give Munoz the benefit of the doubt and focus our inquiry on the single conspiracy count against him, Count One, his claim fails.

"We will not reverse a conviction because a single conspiracy is charged in the indictment while multiple conspiracies may have been revealed at trial unless the variance is [1] material *and* [2] substantially prejudiced the defendant[]." *United States v. Edouard,* 485 F.3d 1324, 1347 (11th Cir.2007) (alterations in original) (emphasis in original) (internal quotation marks and citation omitted). We first determine whether there was a material variance—whether the evidence supports the jury's conclusion that a single conspiracy existed. "[A] jury's conclusion that a single conspiracy existed should not be disturbed as long as it is supported by the evidence." *United States v. Richardson*, 532 F.3d 1279, 1284 (11th Cir. 2008). "A material variance will only result if there is no evidentiary foundation for the jury's finding of a single conspiracy, and only then will it need to be determined whether the variance requires reversal, i.e., whether it substantially prejudiced [the defendant]." *Id*. "To determine whether the jury

21

could have found a single conspiracy, we consider: (1) whether a common goal existed; (2) the nature of the underlying scheme; and (3) the overlap of participants." *Edouard*, 485 F.3d at 1347 (internal quotation marks and citation omitted).

Count One charged Munoz and codefendants Diaz-Fernandez, Watkins, Silverio ("Chencho"), Barragan-Velez, Zagal-Garcia ("Tono"), Garcia-Gasper, and Aguilar-Hernandez of conspiring to possess with intent to distribute one kilogram or more of heroin from in or about April 2014 through on or about December 17, 2015.  Ample evidence demonstrated that the Count One co-conspirators shared a common goal to distribute narcotics.  Watkins and Diaz-Fernandez planned to distribute cocaine when they conceived the scheme as cellmates in April 2014, but in early 2015, they agreed to the terms of a heroin supply and distribution chain that extended from Mexico to Atlanta, Miami, and West Palm Beach.

The evidence of participant overlap was also significant.  Although the players were often separated by miles, they worked together like the parts of a smooth-running machine to accomplish the conspiracy's purpose.  From a base in Mexico, Diaz-Fernandez and Nephew oversaw the transportation of kilogram quantities of heroin to Atlanta, where Chencho stored it at his apartment.  After arranging transactions through Diaz-Fernandez and Nephew by phone, Watkins made trips to Atlanta and picked up his heroin supply from Chencho.  Watkins

22

then sold the heroin in Miami and paid for the supply that he had received by handing money to Chencho in Atlanta or sending wire transfers. And following Chencho's arrest in Atlanta, Diaz-Fernandez transported heroin to West Palm Beach, where codefendants Garcia-Gasper and Aguilar-Hernandez delivered two kilograms of heroin to Tono and Watkins on November 11, 2015.

Finally, the government presented substantial evidence of Munoz's knowing participation in the conspiracy charged under Count One. Munoz's participation began, at the very latest, in spring 2015 when he began smuggling drug proceeds to Diaz-Fernandez by repeatedly crossing the United States-Mexico border undetected. Munoz was present during price negotiations between Watkins and No Pictures in spring 2015, he wired money to Watkins for the acquisition of a stash house in Miami in November 2015, he played an integral role in the attempted heroin transaction that took place on December 3, 2015, and he reported the events of the foiled drug deal to Diaz-Fernandez, reassuring him that Munoz could be trusted. Far from an unwitting participant, the evidence showed that Munoz had constant contact with Diaz-Fernandez, who trusted him as a confidant and partner in the criminal scheme charged under Count One.

After careful review, we easily conclude that substantial evidence supports the jury's finding of a single, cohesive conspiracy under Count One. Even if we had concluded otherwise, Munoz fails to show prejudice, which exists under two

23

circumstances: (1) "where the proof at trial differ[s] so greatly from the charges in the indictment that the defendant [is] unfairly surprised and ha[s] an inadequate opportunity to prepare a defense" or (2) "where there are so many defendants and so many separate conspiracies before the jury that there is a substantial likelihood that the jury . . . transfer[red] evidence from one conspiracy to a defendant involved in another." *United States v. Caporale*, 806 F.2d 1487, 1500 (11th Cir. 1986) (citations omitted).  Neither circumstance exists in this case.  Munoz was not charged under the separate conspiracy charge against  Pitts under Count Three, and evidence of Pitts's activities selling packs of heroin capsules in Miami was easily distinguished from the evidence against Munoz.

### D.    Munoz:  Drug Quantity

We review for clear error a district court's underlying determination of drug quantity attributable to a defendant, *United States v. Rodriguez*, 398 F.3d 1291, 1296 (11th Cir. 2005), and "we will not find clear error unless our review of the record leaves us with the definite and firm conviction that a mistake has been committed." *United States v. White*, 335 F.3d 1314, 1319 (11th Cir. 2003) (alteration adopted) (internal quotation marks and citations omitted).

When a defendant challenges a fact underlying his sentence, the government shoulders the burden to establish the disputed fact by a preponderance of the evidence.  *Rodriguez,* 398 F.3d at 1296.  To determine drug quantity, the

24

district court must consider "'all acts and omissions committed, aided and abetted, counseled, commanded, induced, procured, or willfully caused by the defendant.'" *United States v. Ryan*, 289 F.3d 1339, 1348 (11th Cir. 2002) (quoting U.S.S.G § 1B1.3(a)(1)(A)). "In the case of a conspiracy, the district court must consider all acts by other participants that were both reasonably foreseeable and in furtherance of the conspiracy." *Id*. (citing U.S.S.G. § 1B1.3(a)(1)(B)).

The PSI prepared for Munoz held him accountable for 19.848 kilograms of heroin, the entire amount involved in the conspiracy, which resulted in a base offense level of 34, and with no adjustments, a total offense level of 34. With a criminal history of III, the proposed advisory range was 188 to 235 months' imprisonment. Munoz objected to the drug quantity, arguing that his accountability was limited to the attempted receipt of two kilograms of heroin on December 3, 2015. At sentencing, after hearing testimony from Stankiewicz and considering the evidence presented at trial, the district court held Munoz accountable for 3,989 grams of heroin. The district court based its finding on Munoz's participation in the attempted, December 3, 2015 transaction and the successful transaction that occurred on November 11, 2015, when Tono and Watkins picked up approximately two kilograms of heroin in West Palm Beach.

The district court's drug-quantity finding reduced Munoz's offense level to 32, resulting in an advisory guideline range of 151 to 188 months. After hearing

25

arguments and considering the PSI, the advisory guideline range, and factors under 18 U.S.C. § 3553(a), the district court sentenced Munoz to 188-month, concurrent sentences under Counts One and Twelve. When asked whether he had any objections to the district court's findings of fact or the way the sentence was imposed, Munoz answered, "No."

Now on appeal, Munoz argues that he entered the conspiracy on December 3, 2015, and the district court therefore erred in holding him accountable for events that occurred on November 11, 2015.

The evidence presented at trial and repeated at sentencing showed that in early November 2015, Diaz-Fernandez planned to move Tono to a new distribution point in Miami and that Munoz assisted the plan by wiring money to Watkins, who would use the funds to acquire a residence/stash house for Tono. The subsequent two-kilogram heroin transaction carried out by other conspiracy members on November 11, 2015 was reasonably foreseeable to Munoz and in furtherance of the conspiracy. And as we have explained, the evidence demonstrated that Munoz joined the conspiracy at least by April 2015. The district court's drug finding is affirmed.

### E.    Munoz:  Minor Role Reduction

For the first time on appeal, Munoz contends that he is entitled to a minor-role reduction under U.S.S.G. § 3B1.2. He claims that the record shows that he

26

was "simply a 'runner' there on December 3, 2015 to pick up money on one occasion."

The district court properly held Munoz accountable for his involvement in the November 11 and December 3, 2015 transactions, which involved a total 3,989 grams of heroin. Munoz's role, particularly on December 3, was far from minor. The evidence showed that he dictated how the attempted transaction would proceed and demanded $26,000 of the anticipated proceeds for himself. As for relative culpability, Munoz arguably played a larger role than other participants in the attempted drug deal, second only to Diaz-Fernandez. Neither Munoz's role in the relevant conduct for which he was held accountable, nor his role compared to other participants in that conduct, supports a finding of a minor role. We find no reversible error.

## IV.  CONCLUSION

For the reasons stated, we affirm Appellants' convictions and sentences.

**AFFIRMED**